Pennsylvania Public Utility Commission *v.*
Gornish et al., Appellants.

Argued October 21, 1938.

Before KELLER, P. J., CUN-

NINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*Francis W. Sullivan,* with him *John J. Gain* and *Thomas C. Egan,* for appellants.

*Thomas M. Kerrigan,* with him *Edward Knuff,* for appellee.

*Sterling G. McNees,* of *McNees, Hollinger & Nurick,* for intervenors.

*H. Z. Maxwell,* with him *Reed, Smith, Shaw & McClay, William Anderson, Jr., George C. Doering, J. F. Shrader, Jackson Wheatley, Grover James* and *M. C. Smith, Jr.,* for intervenors.

OPINION BY PARKER, J., March 3, 1939:

Philadelphia-Pittsburgh Motor Express is a partnership, the members of which, since May 15, 1937, have been engaged in soliciting carriage of freight intrastate by motor vehicles on the public highways and, since about May 26, 1937, have been actually engaged in transporting such freight. They never have had a certificate of public convenience from the state evidencing a right to perform such service. On August 17, 1937, the Public

Utility Commission instituted on its own motion an inquiry and investigation for the purpose of determining whether appellants were violating the Pennsylvania Public Utility Law. An answer was filed on September 13, 1937, averring that Philadelphia-Pittsburgh Motor Express was a contract carrier of freight, and at the same time they made a contract carrier application under the so-called "Grandfather" clause of the Public Utility Law, Act of May 28, 1937, P. L. 1053, §804 (66 PS §1304), alleging that on and prior to June 1, 1937, the effective date of that act, and continuously thereafter they have been transporting personal property under written and verbal contracts. The commission, after hearing, found that the respondents had been operating as common carriers without a certificate of public convenience. It refused the application for registration under the "Grandfather" clause, found the respondents guilty of operating as common carriers without a certificate of public convenience, and imposed a penalty of $3,000.

The controlling question involved in this appeal is whether the appellants were common carriers. We are at a loss to understand how any of our decisions or those of any other jurisdiction should have been so construed as to lead the appellants to believe that the business which the evidence shows they were transacting was anything else than that of common carriage.

It was shown by appellants' own employees and witnesses that prior to June 1, 1935, the appellants solicited contracts for the carriage of freight between Philadelphia and Pittsburgh and intermediate points and procured about fifteen such agreements. Several men experienced in motor transportation were employed to solicit trade. They mailed from Pittsburgh about five hundred announcements advising prospective customers that they had employed certain named individuals of long experience in the motor transportation industry and were confident the company would "serve the Pitts-

burgh Shipping Public in a commendable manner." Notices of a similar tenor were mailed from the Philadelphia office. It was admitted that an arrangement was made to insert in the next issue of the Bell Telephone Directory a classified advertisement of their business. The respondents' witnesses testified to the extensive efforts made to secure customers. Significantly, such witnesses were careful to state that they *contacted* customers, refraining from using the word "solicit."

The appellants usually entered into written contracts for the performance of service but made some oral contracts. Most of the contracts were on a printed form and provided that the carrier should "within the limits of its facilities......carry all freight and property of any and every description, except household goods in use, for Customer within the State of Pennsylvania." They described themselves as contract carriers and agreed to maintain terminal facilities at least in Pittsburgh and Philadelphia. They have developed an extensive business between Pittsburgh, Philadelphia, and intermediate points, going at times outside the usual routes between those two cities. While there was evidence that the carriers in some instances refused to accept perishable freight for transportation, they did in other instances actually haul such freight. If the contract did not provide for the carriage of merchandise of a particular character and if the carriers thought it to be to their advantage, they accepted the goods and then attached a rider to the original contract to cover the merchandise not covered by the original contract. It was made clear by appellants' own witnesses that they were willing to enter into new contracts or attach a rider whenever they would be assured of a load for transportation or if the volume of business of the customers warranted the acceptance of their trade. In short, the appellants were ready to make a contract for shipments with anyone who would ship in truckloads,

or with any consistent shippers, or they would accept less than truckload lots provided they could combine such shipments with other shipments so as to make a full load.

The appellants did not own the trucks used in the transaction of their business but leased them from owner-operators of trucks. On June 1, 1937, they had contracted for the use of four trucks to be operated by such owners and at the time of the hearing were operating twenty-one trucks. Uniform manifests, way bills, delivery receipts, etc., were issued with all the formality of a railroad carrier.

It is the appellants' contention that they are engaged in contract carriage rather than common carriage and this contention is predicated upon the grounds that it transacts all its business under contracts with particular concerns; that they do not hold themselves out to be public carriers or solicit business indiscriminately; that they haul only for persons with whom they have previously contracted; and that they have in some instances refused to enter into contracts.

The Public Service Company Law of 1913 did not attempt to regulate the operations of motor carriers of freight or passengers where the carrier was not a common carrier: *Phillips v. P. S. C.*, 127 Pa. Superior Ct. 341, 344, 191 A. 641. Experience in the administration of the law demonstrated that the public interest required the regulation of certain carriers who were not common carriers. When the Public Utility Law, Act of May 28, 1937, P. L. 1053, replaced the Public Service Company Law, the legislature, in order to coordinate the service and regulation of common carriers by motor vehicles and "to develop and preserve a safe highway transportation system properly adapted to the needs of the commerce of the Commonwealth of Pennsylvania and insure its availability between all points of production and markets of this Commonwealth," (66 PS §1301) enlarged the scope of

the law and provided for the regulation of certain carriers by motor vehicles who were not common carriers. It defined "common carrier by motor vehicle" and "contract carrier by motor vehicle."

Insofar as the question here involved is concerned, the definition as given in the statute followed the previous definitions as established by the the decisions of the courts by saying (66 PS §1102 [6]) that common carrier by motor vehicles "means any common carrier who or which holds out or undertakes the transportation of passengers or property, ...... between points within this Commonwealth by motor vehicle for compensation." The act further provided (66 PS §1102 [7]) that contract carrier by motor vehicle "means any person or corporation who or which provides or furnishes transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes, with or without drivers, any motor vehicle for such transportation, or for use in such transportation, *other than as a common carrier* by motor vehicle," subject to certain further provisions of no importance here. (Italics supplied.)

Section 801, et seq. (66 PS §1301, et seq.), of the present act provides for the regulation of contract carriers and by section 804 (66 PS §1304) it is provided that no person or corporation shall engage in the business of a contract carrier by motor vehicle unless it holds a permit issued by the commission authorizing such person or corporation to engage in such business, subject to the proviso "that, if any such carrier, or a predecessor in interest, was rendering service as a bona fide contract carrier by motor vehicle upon the effective date of this act, over any route or within the territory for which application is made, and has rendered such service since that date, ...... the commission shall

issue such permit without further proceedings, if application for such permit is made to the commission ...... within one hundred twenty days after the effective date of this act [June 1, 1937]."

As the definition of a contract carrier specifically excludes from that class common carriers, it follows that if the appellants were common carriers acting without a certificate of public convenience or permit from a commission they were not entitled to a permit under the so-called "Grandfather" clause.

The definition of a common carrier as applied to those engaged in transportation by motor vehicles has had the consideration of this court in a number of cases. What we said in *Dairymen's Co-operative Sales Assn. v. P. S. C.*, 115 Pa. Superior Ct. 100, 107, 174 A. 826, and repeated in *James v. P. S. C.*, 116 Pa. Superior Ct. 577, 583, 177 A. 343, is directly in point: "In *Gordon v. Hutchinson*, 1 W. & S. 285, Chief Justice GIBSON said that 'any man undertaking to carry the goods of all persons indifferently' is a common carrier. A similar definition and the one usually accepted is that given by the Chief Justice of Massachusetts in *Dwight v. Brewster*, 18 Mass. 50: 'A common carrier is one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place.' This definition has been approved by our Supreme Court in *Beckman v. Shouse*, 5 Rawle 179, and by this court in *Blakiston v. Davies, Turner & Co.*, 42 Pa. Superior Ct. 390, 397. 'We express a doctrine universally sanctioned when we say, that any one who holds himself out to the public as ready to undertake for hire or reward the transportation of goods from place to place, and so invites custom of the public, is in the estimation of the law a common carrier': *Lloyd v. Haugh*, 223 Pa. 148, 154, 72 A. 516."

Turning our attention to the specific grounds depended upon by the appellants to distinguish their operations from those of common carriage, the main

contention relied upon is that they have not performed service without a previous contract, written or oral. The immediate question is not concerned with the appellants' duty to carry but whether they are holding themselves out as engaging in the business of transportation for hire as a public employment. The presence or absence of the kind of contracts disclosed by appellants' own testimony is not controlling in a determination of the question. Contracts, express or implied, are an incident to almost every form of transportation for a compensation. The contention of the appellants is directly opposed to the previous decisions of this court in *Erb v. P. S. C.*, 93 Pa. Superior Ct. 421, and *Bingaman v. P. S. C.*, 105 Pa. Superior Ct. 272, 161 A. 892. The testimony shows that the appellants devoted their transportation facilities to the indiscriminate use of at least a part of the public, and it also disclosed a studied effort to bring themselves within a class of carriers who are not common carriers by the mere device of insisting upon a contract, oral or written, before actually transporting goods. The true character of the appellants' operations is to be determined by what they have been doing rather than by what they say they have been doing. At the time of the hearing the volume of business had increased until its operations extended over half of the Commonwealth and it was employing twenty-one trucks. By solicitation and by advertisement the extent of their business was swelled. This was of itself an admission that they were engaged in a public business and that they were holding themselves out as ready to serve the public generally.

The claim that appellants changed their true character by an occasional refusal to enter into contracts and render service is wholly without merit. "The status of one as a common carrier is not changed by an occasional refusal to perform services for which he is equipped": *James v. P. S. C.*, supra (p. 584). "No carrier serves all the public. His customers are limited

by place, requirements, ability to pay and other facts. The public does not mean everybody all the time": *Piercely v. P. S. C.,* 73 Pa. Superior Ct. 212, 214.

While the law furnishes a definition of the term "common carrier," what constitutes a particular individual such a carrier is a question of fact to be determined from the evidence presented in each case as it arises: *Erb v. P. S. C.,* supra (p. 429). "Mere schemes or devices to avoid the duties and responsibilities of a common carrier are impotent for the purpose intended when the true character of such acts is established": *James v. P. S. C.,* supra (p. 584). The evidence not only supports the conclusion of the commission, but we do not see how it could have come to any other conclusion than it did.

The penalty was imposed in accordance with section 1301(b) (66 PS §1491) of the Public Utility Law. This section imposes a penalty of fifty dollars for "each and every day's continuance in the violation of any regulation." The evidence was sufficient to sustain a finding that those violations covered more than sixty days.

The order of the Public Utility Commission is affirmed.