Merchants Parcel Delivery, Inc., Appellant, *v.* Pa.
Public Utility Commission.

Argued October 13, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD and HIRT, JJ.

*Harold S. Shertz,* with him *Paul F. Barnes,* for appellant.

*Herbert S. Levy,* with him *Harry M. Showalter,* for appellee.

*Bernard G. Segal,* with him *Irving R. Segal, Gilbert W. Oswald, Douglas Brookman, Fred G. Athearn* and *Schnader & Lewis,* for intervenor, appellee.

OPINION BY STADTFELD, J., July 27, 1942:

This is an appeal from an order of the Pennsylvania Public Utility Commission approving amendment of a contract carrier permit so as to allow the transportation of property for twenty-six additional stores in

Philadelphia. Appellant, Merchants Parcel Delivery, Inc., was a protestant before the Commission. The applicant, United Parcel Service of Pennsylvania, Inc., has intervened in this appeal.

On August 16, 1938, the Pennsylvania Public Utility Commission issued a permit authorizing applicant, United Parcel Service of Pennsylvania, Inc. to engage in the business of a contract carrier by motor vehicle, under special and individual contracts, after protests which were withdrawn upon stipulation, to transport merchandise and property for four of the five department stores in Philadelphia, namely, N. Snellenberg & Company, Inc., Gimbel Brothers, Inc., John Wanamaker, and Strawbridge & Clothier, from points in the City of Philadelphia to points within 125 miles air line distance of the Philadelphia City Hall, and to return damaged and returned goods from the said points to Philadelphia.

This permit holder, on May 17, 1940, filed an application with the Commission, to add to the above permit, authority to perform transportation services for twenty-six (26) named retail specialty shops in the City of Philadelphia, within the same area and in the same manner as authorized by its above existing permit.

Formal hearings were held on the application June 26, 27 and 28, 1940, at which certain motor and rail carriers appeared in protest against granting of the application. All protests were withdrawn upon stipulation except that of appellant herein, Merchants Parcel Delivery, Inc.

Merchants Parcel Delivery, Inc. conducts a business principally in distribution from retail stores to their customers, established in 1883. Since its incorporation in 1916 it has operated under authority of the Pennsylvania Commission. Its present certificate authorizes it as a common carrier by motor vehicle to transport packages between points in the metropolitan area of

Philadelphia, bounded by or including Marcus Hook, Glen Riddle, Paoli, Norristown, Blue Bell, Ambler, Willow Grove, Hollywood and Cheltenham.

Merchants Parcel Delivery, Inc. protested the approval of the application on the ground that the applicant had assumed the status of a common carrier under the Pennsylvania Public Utility Law of May 28, 1937 P. L. 1053, amended, (66 PS §1101 et seq.) and that the amendment applied for would not be consistent with the public interest or the policy declared in Section 801 of the Public Utility Law (66 PS §1301).

The Public Utility Commission, by its order of March 24, 1941, here appealed from, found that the proposed operations were those of a contract carrier and that the granting of the application would be consistent with the policy declared in Section 801 of the act. The order authorized the service of the 26 stores covered by the original application although at hearing the applicant moved to amend its application by eliminating the name of one of the stores therefrom.

On May 6, 1941, Merchants Parcel Delivery, Inc. filed this appeal from the Commission's order of March 24, 1941. On May 13, 1941, the United Parcel Service of Pennsylvania, Inc. filed a petition with this court for leave to intervene as a party appellee, which was allowed on May 15, 1941.

The essential findings of fact of the Commission, contained in its opinion, establish that applicant was not holding itself out to serve the general public or any class thereof within the limits of its capacity; that the proposed service of applicant was of the same restricted nature, and to be performed under the same conditions and with substantially the same equipment as the present service of applicant, which previously were held by the Commission to be contract carriage; that applicant's service was of a specialized and personalized nature, not performed by common carriers, and calculated to meet the peculiar needs of specialty shops in the delivery

of their merchandise to their customers; that the service proposed by applicant would be more advantageous in enabling the specialty shops to compete equally with their competitors than their present service, and that it would therefore serve the commercial interests of the Commonwealth; that the protesting common carrier would not suffer any loss if the present application were granted, and that the common carrier directly affected had advocated its approval in the public interest; and that approval of the application would be consistent with policy declared in Section 801 of the Public Utility Law.

The questions for our consideration are: 1. Did the Public Utility Commission err in finding that the proposed operations of the applicant gave it the status of a contract carrier rather than the status of a common carrier? 2. Did the Public Utility Commission err in finding that the approval of the contract carrier application was consistent with the public interest and the policy declared in Section 801 of the Pennsylvania Public Utility Law?

We quote from the opinion of the Commission: "The record contains ample testimony that applicant's service is of a specialized and personalized nature, calculated to meet the peculiar needs of specialty shops in the delivery of their merchandise to their customers. In addition to the actual transportation of the parcel, applicant also performs other services. These are: (1) It acts as the delivery department of a store; (2) the details of operation are so conducted that the store's system of records and accounting is not disturbed; (3) a store need not change its method of wrapping packages; (4) there is a prompt adjustment of loss or damage; (5) a continuous study is made for the purpose of reducing complaints as to delivery service; (6) the store is advised of modern systems of wrapping and packing, and suggestions for revision of sales slips are advanced; (7) suggestions are made to employes

of the store as to the tactful handling of customers on matters pertaining to delivery; (8) the applicant has a direct telephone line from a store to its sub-station; (9) the applicant's driver waits if a garment is to be tried on by a customer; (10) the applicant has a proper and efficient method of handling C. O. D. accounts, exchange merchandise and complaints; (11) applicant will withhold delivery of a package if the store so instructs; (12) applicant returns declined or rejected merchandise, or merchandise sent by a customer to the store for storage.

"A study of these services shows that most of them are extraordinary services which are not performed by common carriers. In addition the service offered by applicant within the 125-mile radius of City Hall, Philadelphia, is better calculated to meet the needs of the 25 specialty shops than the presently existing common carrier service within a 25-mile radius thereof. Beyond the 25-mile radius the customers of Public Delivery Service are required to ship by parcel post, which is highly unsatisfactory. From all the foregoing we conclude that the service proposed by applicant will be more advantageous in enabling the specialty shops to compete equally with their competitors than is their present service, and that it will therefore serve the commercial interests of the Commonwealth."

In every case United Parcel Service of Pennsylvania, Inc. serves as the entire delivery department of the store. Its ultimate aim is to operate the delivery department of the stores in as dependable, efficient and economical a manner as possible. United has a staff of men devoting their time exclusively to aiding the stores it serves in acquiring the most modern system of wrapping and packing, in revising sales books and other forms used by the store, in training the stores' personnel properly to handle customers in matters pertaining to delivery, in reducing or eliminating complaints from customers as to deliveries, etc.

This work requires the maintenance of a highly trained personnel, and the conduct of constant research projects, both inside and outside the stores. United must perform many functions directly affecting, but not in any way an integral part of, the actual transportation of merchandise or ordinarily considered a carrier's function.

In the actual delivery of packages, United's employes are specially trained to act as representatives of the store whose merchandise is being delivered. They are required, among other things, to wait while the customer tries on a garment; to take back returned goods and to pack the goods in a suitable manner so that they may be returned to the store without damage; to arrange for payment for part and return of part of the goods when desired by the store's customers; to adjust complaints; to make exchanges of merchandise; to take messages from the customers to the store; to set up furniture in the customers' homes; to lay rugs; etc.

United has always exercised a high degree of selectivity in determining which stores to serve. It has often refused to serve stores which have requested its services.

Many factors enter into United's decision as to which stores it desires to serve. Among these factors are the following: location of the store; whether or not the store has a "free and open" delivery policy,—i.e., charges for or discourages delivery; handling facilities at the store; residential location and character of the store's clientele; extent of the store's C. O. D. or charge transactions; value of the goods sold; kind and variety of merchandise; daily fluctuation of volume due to promotional and other sales; number of deliveries, size and weight of merchandise; seasonal fluctuation of business; operating methods and accounting efficiency of the store; reputation of the management for responsibility and business ethics; etc.

Quoting from the opinion of the Commission: "Public Delivery Service, Inc., which would be most directly affected by the granting of this application has not protested. On the contrary, the President thereof, Alvin Rosenberg, appeared in support of the application and testified that the specialty shops were dissatisfied with his present service and had complained thereof that he did not have and could not procure facilities to enable him to render the service they required, and that the needs of these stores could best be served by the type of operation offered by applicant."

These stores are all specialty shops. They are all located on or very close to the shopping district of Chestnut Street, between 8th Street and 18th Street, in Philadelphia.

All of these specialty shops sell the same general type of merchandise and have the same type of customer clientele as corresponding departments in the four department stores which United now serves as a contract carrier. Thus, they constitute a group homogeneous with the department stores, permitting of a delivery service integrated with that rendered to the department stores.

There was testimony that there is not available in Philadelphia any other service which can supply to the 25 specialty shops listed in the application the type, character and quality of service which United supplies to the department stores.

The placing of the name on its trucks by United was done in compliance with the specific rule of the commission that the name and address of contract carriers must appear in letters of not less than two inches in height, and not less than one-half inch in width on the side of each motor vehicle operated by the carrier. (General Order No. 29 revised, Rule 212 and Rule 303)

It appears from the record that every regulatory commission, both State and Federal to which United

has applied for a contract carrier permit, has unequivocally held it to be a contract carrier.

We quote from the report of the Commission: "The holdings of regulatory bodies in other jurisdictions to the effect that applicant's affiliates are contract carriers, and the holding of the Interstate Commerce Commission that applicant is a contract carrier while not controlling upon us, have a persuasive effect. Since it was stipulated of record here that applicant in interstate operations and applicant's affiliates in other states serve department and specialty stores in the same manner as applicant proposes to do in Philadelphia, we are of opinion that it is proper for us, in determining applicant's status to consider the position which both the Federal and other state commissions have taken under similar circumstances."

The common law definitions of common carriers are all to the same effect, and are uniform throughout the country. Despite variations in language, the definitions found in the cases stress the all-important factor that a common carrier is one that holds itself out and undertakes to carry the goods of all persons indifferently, or of all who choose to employ it, and one that invites the custom of the public indiscriminately.

In *Pennsylvania Public Utility Commission v. Gornish et al.,* 134 Pa. Superior Ct. 565, 4 A. 2d 569, a case decided under the Act of May 28, 1937 P. L. 1053, Judge PARKER reviewed some of the well-known definitions of common carrier as follows (at page 571) : " 'In *Gordon v. Hutchinson,* 1 W. & S. 285, Chief Justice GIBSON said that "any man undertaking to carry the goods of all persons indifferently" is a common carrier. A similar definition and the one usually accepted is that given by the Chief Justice of Massachusetts in *Dwight v. Brewster,* 18 Mass. 50: "A common carrier is one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place." This definition has been approved by our

Supreme Court in *Beckman v. Shouse,* 5 Rawle 179, and by this court in *Blakiston v. Davies; Turner & Co.,* 42 Pa. Superior Ct. 390, 397. "We express a doctrine universally sanctioned when we say, that any one who holds himself out to the public as ready to undertake for hire or reward the transportation of goods from place to place, and so invites custom of the public, is in the estimation of the law a common carrier": *Lloyd v. Haugh,* 223 Pa. 148, 154, 72 A. 516.'" See, *Phillips v. Public Service Commission,* 127 Pa. Superior Ct. 341, 345, 191 A. 641; *Weisberger et al. v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 17, 20, 21, 7 A. 2d 731.

Differentiating between common and private (contract) carriers, this court held that the test is whether or not such person holds himself out expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contradistinguished from holding himself out as serving or ready to serve only particular individuals. *Brink's Express Co. v. Public Service Commission et al.,* 117 Pa. Superior Ct. 268, 274, 178 A. 346; *Masgai v. Public Service Commission et al.,* 124 Pa. Superior Ct. 370, 188 A. 599.

Section 2 of the Public Utility Law, as amended, contains the following definitions:

(5) "'Common Carrier' means any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers or any bona fide cooperative association transporting property exclusively for the members of such association on a non-profit basis."

(6) " 'Common Carrier by Motor Vehicle' means any common carrier who or which holds out or undertakes the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes any motor vehicles, with or without driver, for transportation or for use in transportation of persons or property as aforesaid, and shall include common carriers by rail, water, or air, and express or forwarding public utilities in so far as such common carriers or such public utilities are engaged in such motor vehicle operations . . . . . ." It will be observed from the above quoted language, the fundamental undertaking of the common carrier is to transport persons or property for compensation for members of the public indifferently and indiscriminately. See *Klawansky v. Public Service Commission,* 123 Pa. Superior Ct. 375, 187 A. 248.

(7) " 'Contract Carrier by Motor Vehicle' means any person or corporation who or which provides or furnishes transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicles for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes, with or without drivers, any motor vehicle for such transportation, or for use in such transportation, other than as a common carrier by motor vehicle . . . . . ."

We quote from the opinion of the commission " . . . . . . applicant proposes to serve only those specialty shops, otherwise conforming to its standard, which can be integrated into the operation which applicant is now authorized to render and which are acceptable to the department stores presently served by applicant. The proposed service of applicant is of the same restricted nature, and to be performed under the same conditions

and with substantially the same equipment as the present service of applicant which we have previously held to be contract carriage."

Section, 801 of the Public Utility Law provides as follows: "Declaration of Policy.—It is hereby declared to be the policy of the Legislature to regulate in this act the service of common carriers by motor vehicle and forwarders in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in such service, and among such carriers and forwarders in the public interest; to promote safe, adequate, economical, and efficient service by common carriers by motor vehicle and forwarders, and just and reasonable rates therefor, without unjust discrimination, and unfair or destructive practices; to improve the relations between and coordinate the service and regulation of common carriers by motor vehicle, forwarders, and other carriers; to develop and preserve a safe highway transportation system properly adapted to the needs of the commerce of the Commonwealth of Pennsylvania and insure its availability between all points of production and markets of this Commonwealth. It is hereby found as a fact, after due investigation and deliberation, that the service of common carriers by motor vehicle forwarders, contract carriers by motor vehicle, and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, are so closely interwoven and interdependent, and so directly affect each other, that in order effectively to regulate such common carriers by motor vehicle and forwarders, and to provide a proper and safe highway transportation system in the public interest, it is necessary to regulate the service of such contract carriers by motor vehicle and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of pas-

sengers or property over the highways, in the manner set forth in this article."

Section 804(b) of the Public Utility Law (66 PS §1304) provides: "(b) Every application for such permit shall be made to the commission in writing, be verified by oath or affirmation, and shall be in such form and contain such information as the commission may require by its regulations. A permit shall be issued by the commission to any qualified applicant therefor authorizing in whole or in part the service covered by the application, if it appears from the application, or from any hearing held thereon, that the applicant is fit, willing, and able properly to perform the service of a contract carrier by motor vehicle, and to conform to the provisions of this article and the lawful orders or regulations of the commission thereunder, and that the proposed service to the extent authorized by the permit will be consistent with the public interest and the policy declared in section eight hundred one of this act; otherwise such application shall be denied ......"

The scope of review by this court in matters relating to whether or not a proposed contract carrier service is in the interest of the public, and in accord with the policy expressed in Section 801 of the Public Utility Law, is the same as in cases involving the necessity of service by a common carrier.

The Public Utility Law is clear in that regard, for Section 1107 (66 PS §1437) states: "...... The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights ......"

This court has recently outlined the nature of the review by an appellate court in the case of *J. Benkart & Sons Co. et al., v. Pa. P. U. C.*, 137 Pa. Superior Ct. 5, 7 A. 2d 584, wherein Judge RHODES, at page 8, stated:

"We have often stated that in determining such matters as are involved in this appeal this court confines itself to the ultimate question as to whether the commission acted within its powers. *York Motor Express Co. v. P. S. C.*, 110 Pa. Superior Ct. 197, 168 A. 327. The order here deals with an administrative matter which this court may not disturb unless it is clearly shown to be without support in the evidence, or was so arbitrary, capricious, and unreasonable as to amount to error of law, or a violation of constitutional rights. See *Steward v. P. S. C.*, 119 Pa. Superior Ct. 353, 181 A. 329."

The cases relied on by appellant are readily distinguishable from the instant case.

After a careful examination of the entire record, we all agree with the conclusion stated by the Public Utility Commission, to wit: (1) that the status of United Parcel Service of Pennsylvania, Inc., is that of a contract carrier by motor vehicle, and (2) that the granting of that company's application to amend its permit so as to include service to 25 retail specialty stores in Philadelphia is in the public interest and in conformity with the policy expressed in Section 801 of the Public Utility Law.

The assignments of error are overruled and the appeal is dismissed.

DISSENTING OPINION BY KELLER, P. J.:

I am in substantial accord with the views expressed by Commissioner Buchanan in his dissenting opinion. For the reasons given by him in that opinion, I enter my dissent.

The opinion of Commissioner Buchanan is as follows:

It is my opinion that the present application for a contract carrier's permit should be refused because the applicant is actually engaged in common carriage. United Parcel is presently serving four mercantile

stores as a contract carrier. Through solicitation, persuasion, coercion and purchase, it now seeks to increase that number to twenty-nine and retain its standing as a contract carrier.

It has been not only the practice and the policy of this Commission, but also of its predecessor, to hold that contract carriage vanished when the number of contracts was increased through solicitation to the point where the application "contract carriage" became merely camouflage for common carriage. This opinion has been sustained without exception by the appellate courts of Pennsylvania. *Erb v. Public Service Commission*, 1928, 93 Pa. Superior Ct. 421; *Keystone Warehousing Company v. Public Service Commission*, 1932, 105 Pa. Superior Ct. 267, 161 A. 891; *Bingaman v. Public Service Commission*, 1932, 105 Pa. Superior Ct. 272, 161 A. 892; *Marshall v. Public Service Commission*, 1937, 129 Pa. Superior Ct. 272, 195 A. 475; *Gornish v. Public Utility Commission*, 1938, 134 Pa. Superior Ct. 565, 4 A. 2d 569; *Spackman v. Public Utility Commission*, 1940, 141 Pa. Superior Ct. 164, 14 A. 2d 839.

I have been unable to discover one case before the appellate courts of Pennsylvania where a carrier, engaged solely in the transportation business, serving a class of shippers to the extent proposed to be served in this case, has not been held to be a common carrier.

On the same day the present application was approved, the application (A. 34506, Folder 4) of Arthur W. Klose and Walter G. Klose, trading as Klose Brothers, was also approved. In that case, the applicant sought the right to transport, as a common carrier, parcels, packages, and merchandise, from 14 retail department stores and specialty shops in the City of Chester, the identical type of service rendered by the applicant. The Commission authorized the issuance of a certificate as a common carrier. The most consistent element in both cases is that the attorney for the appli-

cant in the Klose case was attorney for protestant in the instant case.

A service similar to that of applicant has been rendered in Pittsburgh by Stores Delivery Service. This Commission held it to be a common carrier and a certificate was issued to the Stores Delivery on November 9, 1936, and amended August 7, 1940, for service as a common carrier. Like the applicant, Stores Delivery is nationwide in its activity.

The cases of *Weisberger v. Public Utility Commission*, 1939, 137 Pa. Superior Ct. 17, 7 A. 2d 731; *Aronimink Transportation Co. v. Public Service Commission*, 1934, 111 Pa. Superior Ct. 414, 170 A. 375, and *Brink's Express Co. v. Public Service Commission*, 1935, 117 Pa. Superior Ct. 268, 178 A. 346, relied upon by applicant, are not in point. In the Weisberger case, the appellant was hauling milk to its own dairy as part of its dairy business. Such transportation was held to be private carriage. In the Aronimink case, the appellant was transporting its tenants to and from its apartment house, without charge, as an incidental part of its business of operating an apartment house and it also was held to be private carriage. In the Brink's case, the appellant was in the business of safeguarding and protecting money and valuable securities and the transportation of the valuables was held to be merely incidental to its business of guarding them. In the present situation, the only business of applicant is the transportation of merchandise for retail stores. There can be no more comparison between the Brink's service and United Parcel service than between the store payrolls transported by the former and a tin coffee pot transported by the latter.

United Parcel Service is well known in the transportation field as being in the business of transporting merchandise for retail stores. It now serves four department stores and out of a list of a possible 100 ship-

pers now served by a certificated common carrier it picked out 28 which it was desirous of serving. It actively solicited the business of the 28. In three weeks it succeeded in obtaining contracts with 26 of them, one of which was later cancelled. Two other large stores in Philadelphia were called upon but no contract was consummated with either. Applicant, upon request, considered the advisability of serving an additional dozen stores. It even approached the protestant in an effort to take over some of its accounts.

Service to the 25 new shippers will be rendered without the addition of any new equipment except, possibly, a few new trucks for reserve and the Christmas holiday season. Applicant has thus steadily increased the number of its shippers so that it will serve, with virtually the same equipment, a total of 29 shippers, and, it further admits it would serve, up to the limit of its facilities, any additional shippers that satisfied its required standards if the additional service did not impair its efficiency. Carrying property to the limit of facilities and holding out to the public willingness to serve subject to tariff requirements are incidents of common carriage. *Piercely v. Public Service Commission,* 1919, 73 Pa. Superior Ct. 212.

The fact that contracts have been entered into does not by that alone constitute contract carriage. Contracts, express or implied, are an incident to nearly every form of transportation, whether common or private carriage. *Erb v. Public Service Commission,* supra; *Keystone Warehousing Co. v. Public Service Commission,* supra; *Bingaman v. Public Service Commission,* supra.

Refusal or rejection of service does not remove the transportation from common carriage. *Keystone Warehousing Co. v. Public Service Commission,* supra; *Gornish v. Public Service Commission,* supra; *Erb v. Public Service Commission,* supra.

The applicant sets up 14 requirements which its customers must meet in order to qualify for the service which it renders and upon those 14 requirements it bases its right to a contract carrier's permit. "The test [of common carriage] is, therefore, whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contradistinguished from holding himself out as serving or ready to serve only particular individuals ......" *Masgai v. Public Service Commission*, 1936, 124 Pa. Superior Ct. 370, 188 A. 599, 600.

Rules under which a carrier operates or conditions under which a service will be rendered are usual incidents of any filed tariff. These 14 requirements could be incorporated in the filed tariff of the applicant as a common carrier and restrict the operation if not held to be discriminatory. Every carrier, common or contract, would like to confine itself to the most lucrative part of its business, as described by the standards of the applicant. But if such were permitted, transportation would immediately fall into a chaotic state. "No carrier serves all of the public. His customers are limited by place, requirements, ability to pay and other facts. The public does not mean everybody all the time". *Piercely v. Public Service Commission*, 1919, 73 Pa. Superior Ct. 212, 214. *Dairymen's Cooperative Sales Association v. Public Service Commission*, 1934, 115 Pa. Superior Ct. 100, 174 A. 826.

There are two additional reasons for denial of this application. First, an examination of our files clearly reveals a monetary reason why applicant desires to be classed as a contract carrier, rather than a common carrier. In the year 1938, the applicant grossed $817,224 in operations for the four department stores between September 1 and December 31. (Applicant did not begin to render service until September 1, 1938). Under

the law, as a contract carrier, it contributed nothing toward paying Commission regulatory expenses. In the same year, the protestant, for the full year, grossed only $130,784. On that sum it paid as a common carrier an assessment of $738.80. For the year 1939, the applicant did a gross business of about $1,940,000 with the four department stores. It will pay no assessment on that volume. For the same year, the protestant did a gross business of $152,731. Although the assessment for 1939 has not, as yet, been determined protestant will be required to pay a further assessment for regulation of the motor vehicle industry and applicant will pay nothing.

The applicant is thus receiving the benefit and protection of Commission regulation but contributes nothing to the expenses of the Commission. Applicant, if classed as a common carrier, as in fact it is, would be subject to an assessment and would pay its way equally with the one truck operator and all other common carriers, big or little. It should be emphasized that the fact applicant does not pay an assessment gives it a big competitive advantage against a common carrier in the matter of rates.

Secondly, the approval of the present application is inconsistent with the public interest and the policy declared in Section 801 of the Public Utility Law, 66 PS §1301, and our prior decisions on this subject. In Application of Contract Trucking Corporations, 31 P.U.R., N.S., 403, 1939, we said, at page 406 that: "...... the purpose of the Legislature, in addition to its primary desire to develop and preserve a safe highway transportation system properly adapted to the needs of commerce, in extending the jurisdiction of the Public Utility Commission to cover contract carriers, is 'to promote safe, adequate, economical and efficient service by common carrier by motor vehicle, ...... and just and reasonable rates therefor, without unjust discrimination,

and unfair or destructive practices,' and 'to regulate ...... the service of common carriers by motor vehicle ...... in such manner as to recognize and preserve the inherent advantage of, and foster sound economic conditions in such service ...... in the public interest ......' The service of common carriers by motor vehicle and contract carriers by motor vehicle were found by the Legislature to be closely interwoven and interdependent, and so directly affect each other, that in order effectively to regulate common carriers by motor vehicle it was found necessary to regulate the service of contract carriers by motor vehicle. Therefore, it seems to us, that the purpose in regulating contract carriers is the preservation of the inherent advantages of common carriage by motor vehicle and the fostering of sound economic conditions in such service in the public interest."

From that standpoint, the approval of the present application does not preserve the inherent advantages of common carriage by motor vehicle and the fostering of sound economic conditions in such service in the public interest. On the contrary, the exact opposite will result. A contract carrier is here permitted to obtain the cream of the parcel delivery traffic without a corresponding duty to serve those who may require service but whom applicant will refuse to serve because their business is not highly profitable to applicant. The inevitable result will be a gradual shrinkage of common carrier service to all other specialty shops in the Philadelphia area and a multiplicity of contract carriage over present concentrated common carriage. The only specialty shops left to common carriers, if any, will be those having such a small volume of business that the carriers will not survive. This is clear from the present record. Certainly, approval of the application, as a contract carrier, is not in the public interest.

United Parcel Service is a common carrier because it

renders a common carrier service to a certain class of merchants in the Philadelphia area; because it is in direct competition with other common carriers performing a similar service in that area; because it solicits shippers presently doing business with common carriers, because contract carriage permits discrimination in rates and service and finally, because it is contrary to the public policy as declared by the Legislature and all of the prior decisions of this Commission and the appellate courts of this Commonwealth.