Chemical Tank Lines, Inc. et al., Appellants,
*v.* Pennsylvania Public Utility
Commission.

608

Argued September 16, 1960. Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ.

*Paul F. Barnes* and *Robert H. Shertz,* with them *Shertz, Barnes & Shertz,* for applicants, appellants.

*Frederick L. Kiger,* for applicant, appellant.

*Miles Warner,* Assistant Counsel, with him *Joseph I. Lewis,* Chief Counsel, for Pennsylvania Public Utility Commission, appellee.

*Robert J. Stewart, Harry H. Frank,* and *Christian V. Graf,* with them *Richard H. Rea,* and *Anderson & Stewart,* and *McNees, Wallace & Nurick,* for protestant motor carriers, intervening appellees.

*Carl Helmetag, Jr.,* with him *Richard E. Costello, Lockwood W. Fogg, Jr., Malcolm R. Warnock, James N. Mullen,* and *Harris J. Latta,* for railroads, intervening appellees.

*Robert R. Wertz,* for cement producer, interested party, under Rule 46.

*J. H. Ward Hinkson,* for cement producer, interested party, under Rule 46.

*George G. Chandler,* with him *John F. Headly,* and *Montgomery, McCracken, Walker & Rhoads,* for cement producer, interested party, under Rule 46.

*Bernard Eskin,* and *Wolf, Block, Schorr and Solis-Cohen,* for cement producer, interested party, submitted a brief, under Rule 46.

*Thomas E. Weaver,* and *Weaver & Weaver,* for cement producer, interested party, submitted a brief, under Rule 46.

*George F. Coffin,* for cement producer, interested party, submitted a brief, under Rule 46.

*Walter J. Symons,* for cement producer, interested party, submitted a brief, under Rule 46.

*Louis M. Stamberg,* and *Morris Gerber,* for cement producer, interested party, submitted a brief, under Rule 46.

*Ernest Scott,* and *Pepper, Hamilton & Scheetz,* for cement producer, interested party, submitted a brief, under Rule 46.

OPINION BY RHODES, P. J., November 16, 1960:

These appeals are from the order of the Pennsylvania Public Utility Commission dated April 4, 1960, refusing and dismissing the applications of four common carriers, Chemical Tank Lines, Inc., Top Transport, Inc., E. Brooke Matlack, Inc., and Modern Transfer Co., Inc., inter alia, and one contract carrier, Schwerman Company of Pennsylvania, Inc., seeking authority to transport cement in bulk and in bags by motor truck from cement plants in eastern Pennsylvania to intrastate points in Pennsylvania. The end result of this order of the commission is to limit the cement industry in eastern Pennsylvania to intrastate shipment of their products wholly by rail except for existing rights given to three motor truck carriers, to wit, Harold C. Gabler, Coastal Tank Lines, Inc., and Seaboard Tank Lines, Inc. The rights granted to Gabler, Coastal, and Seaboard were limited to transportation by truck of cement in bulk, and included only off-rail delivery points, that is, places where no rail siding existed. The services of the three common carriers authorized to render bulk transportation to off-rail points in eastern Pennsylvania are not utilized by the industry.

The commission refused the applications on the grounds that the need for the proposed service and the inadequacy of existing rail and motor carrier service were not shown, especially since the existing motor

carrier service has not been utilized. The applicant motor carriers who have appealed, and the cement producers who supported the applications and participate in these appeals question the commission's action, contending that the need for the proposed service and the inadequacy of the existing service are clear.

As the commission's order of April. 4, 1960, observes, this case presents "issues of great economic importance to the cement industry in Pennsylvania, to the carriers by whom their product has been or is sought to be transported, and to the public at large."

In the proceedings before the commission a greater number of applicants requested authority to serve the cement industry and its customers than are involved in the present appeals. There were thirteen applicants to the commission who filed twenty-seven separate applications seeking authority as motor carriers, common or contract, to transport dry bulk cement in tank or hopper-type vehicles and dry cement in bags or containers.

The applications fell into three groups. The first group, of which most are presently transporters of other commodities by motor vehicle in bulk, sought authority to transport cement both in bulk and in packages to all points in Pennsylvania from twenty specifically designated plants and plant sites of cement manufacturers located in eastern Pennsylvania. This first group includes appellants Chemical Tank Lines, Inc., Top Transport, Inc., E. Brooke Matlack, Inc., and Modern Transfer Co., Inc., who sought the authority as common carriers. Also in the first group were appellant Schwerman Company of Pennsylvania, Inc., and Cement Express, Inc., who sought authority as contract carriers. With one exception, the applications proposed that only one carrier would serve each cement producing company or plant. The exception

was that Universal Atlas Cement Division, United States Steel Corporation, sought the services of both Modern and Schwerman. This first group of applicants had the support of the cement industry before the commission as well as on these appeals. All of this group except Cement Express, Inc., have appealed and constitute the appellants before this Court.

Four additional applications were filed asking for authority to transport, as common carriers, cement in bulk or in packages from the counties of Lehigh, Northampton, and York to points in Pennsylvania. These applications are referred to in the commission's order as the second group. The scope of these applications was substantially broader than that of any single member of the first group of applicants because the rights requested included authorization to transport for any shipper. These applications were supported by consignees but not by the cement industry, the shippers. None of this group appealed from the refusal of their applications.

The third group of applicants consisted of the wholly owned motor carrier subsidiaries of three of the rail carriers who protested the applications of the first and second group. These carriers sought authority to transport cement in bulk or in packages to points in Pennsylvania from or to various enumerated plants. These applications were favored by some consignees but not by the cement industry, the shippers. There has been no appeal by any of this group from the refusal of the applications.[1]

---

[1] The appellants in these appeals are—Chemical Tank Lines, Inc., Top Transport, Inc., E. Brooke Matlack, Inc., Modern Transfer Co., Inc., and Schwerman Company of Pennsylvania, Inc.

Supporting the appellants under Rule 46 are—Universal Atlas Cement Division, United States Steel Corporation, Coplay Cement Manufacturing Company, National Portland Cement Company, Her-

The applicants in the first and third groups also filed applications with the Interstate Commerce Commission for interstate authority to transport cement from all of the points of origin here involved. Most of these interstate applications requested authority to serve as contract carriers to various cement consignors, including the eastern Pennsylvania producers. If the applications were granted, both interstate and intrastate, the applicants of the first group propose to conduct for the eastern Pennsylvania cement industry a combined interstate and intrastate loading and carrying operation using the same personnel, vehicles, and facilities simultaneously and interchangeably for each shipper. There does not appear to have been a final disposition of the interstate applications.

Although the record and the briefs are voluminous, there is actually no real dispute as to certain basic facts. The cement producers here involved constitute the entire Portland Cement manufacturing industry in eastern Pennsylvania, most plants being located in what is known as the Lehigh Cement District.[2]

The eastern Pennsylvania cement plants have a production capacity of approximately 44,000,000 bar-

---

cules Cement Company, Nazareth Cement Company, Whitehall Cement Manufacturing Company, Keystone Portland Cement Company, Giant Portland Cement Company, and Allentown Portland Cement Company.

The appellee is the Pennsylvania Public Utility Commission.

Intervening appellees are—Harold C. Gabler, Coastal Tank Lines, Inc., Seaboard Tank Lines, Inc., Lehigh Valley Railroad Company, Reading Company, The Delaware, Lackawanna and Western Railroad Company, and The Pennsylvania Railroad Company.

[2] With the exception of one cement plant located in West Conshohocken, Montgomery County, and another near York, all of the cement plants involved are located in Lehigh, Northampton, and Berks counties.

rels of finished cement a year or about 8.3 million tons. As found by the commission, the annual rate of sales and shipments based upon the 1958 record appears to be approximately 6.5 million tons. Approximately three quarters of the total production is shipped in bulk, the balance generally being shipped in paper bags. The proportion of package to bulk shipments varies from plant to plant, depending largely upon the type of cement produced. For example, Universal Atlas, which has a great diversity of product, markets 45 per cent of its product in packages; on the other hand, Whitehall Cement Manufacturing Company and National Portland Cement Company market all except 15 per cent of their production in bulk. The amount which is sold in intrastate commerce varies from plant to plant, but on the whole the intrastate traffic appears to be approximately one fourth of the total production of the eastern plants.

Except for one plant situated in York County which has utilized motor transportation of its product under a leasing arrangement, virtually all finished cement produced in eastern Pennsylvania has moved by rail. On March 9, 1959, the commission granted authority to the three motor carriers, the intervening appellees, Harold C. Gabler, Coastal Tank Lines, Inc., and Seaboard Tank Lines, Inc., to transport cement in bulk in motor tank vehicles throughout eastern Pennsylvania to consignees lacking rail connections at point of use. As stated, the eastern Pennsylvania cement producers do not utilize the services of these motor carriers. In fact, in the proceeding in which these three carriers received their rights eastern cement producers opposed the applications, contending at that time that the existing rail service, even as it affected off-rail consignees, was adequate, that conversion of loading facilities at the cement producing plants to accommo-

date motor vehicles would be prohibitively expensive, and that no such conversion was contemplated.

The eastern Pennsylvania cement producers support the present applications on the basis that there is presently existing a need for the motor carrier service of the nature, type, and scope proposed by the appellants, but not of the nature, type, and scope authorized to be rendered by the previously certificated motor carriers. It appears that between 1956 and 1957 a buyer's market for finished cement developed so that the available supply of cement generally exceeds the demand. It was the position of the appellants and the supporting cement producers (1) that motor carrier service for both bulk and packaged shipments to both on-rail and off-rail sites is now necessary to all points in Pennsylvania in order to meet increasing out-of-state and western Pennsylvania competition; (2) that rail service in its present form will continue to be essential for both bulk and package deliveries; and (3) that each cement producing plant must be served by a single motor carrier (two carriers in the case of Universal Atlas) using equipment dedicated exclusively to that shipper's service. The desire to have one motor carrier serving each plant was motivated by a number of reasons, chief of which were the need to co-ordinate loading and inspection schedules, the avoidance of contamination of the product, the facility with which shipments must be diverted or substituted while in transit, the training of personnel, the need for loading truck shipments in advance of the actual receipt of orders, and the necessity for around-the-clock operations during peak delivery periods.

It is the contention of appellants and the cement producers that the need of the cement producing industry in eastern Pennsylvania for motor transportation developed subsequent to the time that Gabler,

Coastal, and Seaboard were granted authority, and that the need which arose was of a more specialized nature and covered a broader destination territory than the service which the existing motor carriers were authorized to render.

The testimony demonstrative of the need of each of the cement producers was basically identical in all instances. The testimony produced by Allentown Portland Cement Company, which desired the services of applicant Chemical Tank Lines, Inc., was illustrative of such testimony.

Elmer D. Schuler, Vice President of Allentown Portland Cement Company, testified that his company has a rated capacity of 4,550,000 barrels. Rail service is by the Reading Company. Seventy-five per cent of the cement produced moves in bulk; 25 per cent in bags. At present, 45 to 50 per cent of its production is sold in Pennsylvania. The company produced a list of thirty-eight counties with points to which shipments are regularly made. In addition, there are ambulatory shipments to highway contractors which may be on rail or off rail. The main competing producers have plants located in Maryland, the Hudson River area of New York, and West Virginia. The Allentown Portland Cement Company decided to use trucking service early in 1959 when the out-of-state competitors announced they were going to make truck deliveries into Pennsylvania in the spring of that year. The company official testified that it seeks to be competitive and to give trucking service when and where the customers want it. It desires to be able to cover all points in Pennsylvania, and to do so it must be able to hold itself out to serve all points. At present no motor carrier has the complete authority which applicants seek. It would not be satisfactory to use a carrier restricted to off-rail points because the company

would not be able to serve all its customers. Similarly, limitation to bulk transport would not be satisfactory because many customers want cement in bags as well as in bulk. The customer would decide the mode of shipment. If the mode is to be by truck, the company wants to use Chemical Tank Lines, Inc. This carrier was selected because the company believed it to be the best carrier. Finally, the company spokesman stated that, should the application be denied, the company would resort to private carriage.

Other cement producers testified that there were numerous requests from customers for delivery in bulk and in bags by motor carriers; that customers require delivery to job sites or other destinations where no rail sidings are available; that cement producers will be able to ship in smaller quantities with the proposed motor carrier service; that on many occasions rail service is too slow to meet the requirements; that motor carrier service as well as rail service is required throughout the entire state; that the proposed single carrier type operation will alleviate the great danger of contamination of product; that a single carrier system will permit the cement producers to have available flexible service enabling shipments once commenced to be redirected while en route; that, due to the change from a seller's market to a buyer's market which developed between 1956 and 1957, there is an oversupply of cement and the inability to furnish truck deliveries to customers is resulting in a loss of customers to competitors.

All of the cement producers have programs involving extensive changes and improvements in their present loading facilities in order to accommodate the use of tank and flat bed motor vehicle equipment which the appellants propose to furnish. Under this program most of the cement producers will enlarge and

alter their facilities so as to enable them to load bulk cement in tank trucks as well as in the presently used railroad hopper cars. They intend and are largely committed to spend substantial sums of money to accomplish these changes. The Nazareth Cement Company plans to spend $750,000; Giant Portland Cement Company plans to spend $900,000. The other cement companies also plan alterations costing substantial sums of money. Appellant carriers likewise are committed to substantial expenditures in order to render the proposed service. For example, Top Transport plans to invest approximately $800,000 to finance its proposed service to the Lehigh Portland Cement Company. It will initially furnish 43 tractor vehicles, 35 bulk trailers, and 10 flat bed trailers. All of the other appellant carriers are committed to great expenditures of funds for such things as terminal facilities, tractors, tank trailers, and flat bed trailers in order to serve the needs of the cement producers. The total plant and equipment expenditures run into millions of dollars.

In general it was proposed that the appellants would maintain their carrier equipment and in some instances supply dispatchers at the plants of the cement producers to facilitate, expedite, and co-ordinate the loading and shipping schedules. In substance the appellants proposed a service which would be integrated with the cement plant operations.

With the completion of such programs and in the event of the grant of authority to the appellants, the cement producers estimated that approximately 25 to 30 per cent of the intrastate traffic presently carried by rail will be handled by the appellant motor carriers. If the appellants are not granted the authority the cement producers intend to acquire private motor carrier facilities to meet the competition.

What may constitute a need for service depends upon the locality involved and the particular circum-

stances of each case. *Noerr Motor Freight, Inc. v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 322, 330, 124 A. 2d 393. The sufficiency of the evidence to support a grant of authority is directly related to the nature and the extent of the authority sought. Thus, as here, where the authority requested is limited in that it proposes service originating from one or a very limited number of shippers, the evidence which will support the authority need relate only to the needs of those shippers, even though the territorial area into which the shipments are to go is extensive. *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission,* 185 Pa. Superior Ct. 115, 123, 138 A. 2d 279. The evidence here related to the needs of specific cement producers, and the authority sought by each of the applicants was to serve only those specific cement producers. The need which was demonstrated was in the nature of an extraordinary, restricted, or specialized one, requiring a specialized and integrated type of service calculated to meet the peculiar requirements of the cement industry and such as is usually found in cases involving contract carriers. See *Merchants Parcel Delivery, Inc. v. Pennsylvania Public Utility Commission,* 150 Pa. Superior Ct. 120, 123, 125, 128, 28 A. 2d 340. There is little, if any, practical distinction between a Class D common carrier seeking authority to serve a particular shipper and a contract carrier; it is the substance of the proceeding and its ultimate effect, not the form of the application, which controls. *Wiley v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 309, 321, 322, 142 A. 2d 763.[3]

---

[3] The appellant Schwerman applied for contract carrier rights and was heard on a separate record. The testimony relating to the requirements of the cement producers proposed to be served by Schwerman and the program for handling the shipments were es-

When the burden upon the appellant carriers in these proceedings and the sufficiency of the evidence offered are measured against the restricted or limited nature, extent, and type of authority sought, the conclusion is inescapable that the need for the proposed service has been established. *Wiley v. Pennsylvania Public Utility Commission,* supra, 186 Pa. Superior Ct. 309, 321, 142 A. 2d 763. The evidence was virtually undisputed as it related to need.

Briefly summarized, the need arose and was demonstrated by the change in market conditions in the cement industry, and the growing competition of western Pennsylvania and out-of-state cement producers. The latter, who are selling in Pennsylvania, have a competitive advantage because of the availability of motor carrier service similar to that sought here. It appears that the eastern Pennsylvania cement producers desire and have a growing and potential competitive need for motor carrier service as well as existing rail service throughout the state for bulk and bag deliveries to destinations both on rail and off rail. There is evidence of the request of customers, located at both on-rail and off-rail points, for delivery in bulk and in bags by motor carriers. Likewise, there is evidence of a need to deliver cement to ambulatory job sites and other destinations where no rail sidings are available. The cement producers need facilities in some instances to ship cement in small quantities. There was evidence as to the slowness of rail service at times. The evidence revealed that cement producers need flexible service such as would enable shipments once commenced to be diverted while en route. It was tes-

sentially the same as in the other cases. Under the circumstances, we deemed it appropriate to consider all of the appeals together, although recognizing the technical distinction between contract and common carriers.

tified that there was economic need to have complete and co-ordinated service available from a single carrier; that there should be standardized carrier equipment co-ordinated with the loading facilities of the producers; that there be advanced scheduling and loading of vehicles. There was also testimony that there would be great danger of contamination of product unless control of equipment such as proposed by the appellants is maintained.

The inadequacy of the existing rail and motor carrier service to render the specialized service sought to points throughout Pennsylvania is likewise apparent.

Rail service alone is inadequate because of the necessity to have motor carrier service to off-rail points and to meet the motor carrier service offered by western Pennsylvania and out-of-state competitors of the eastern cement producers. See *Pittsburgh and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission,* 170 Pa. Superior Ct. 411, 85 A. 2d 646. The issue of inadequacy, as the commission recognized, is whether the rail service as supplemented by the existing motor carrier service is adequate.

The motor carrier service available from the existing motor carriers is inadequate to fulfill the needs of the cement producers as those needs have been shown in this record. The appellant motor carriers and the cement industry maintained that the motor carriers presently authorized to haul cement are so limited in authority and facilities that they are unable to meet the transportation requirements of the cement industry. The certificates of Gabler, Coastal, and Seaboard (1) prohibit service to Pennsylvania customers using bag cement, (2) limit these carriers to transportation of bulk cement but only to customers having no rail sidings, and (3) limit these carriers territorially to only eastern Pennsylvania. The testimony of the ce-

ment producers indicated that they have not used and that they cannot use the limited service of these three carriers because of their need for the complete service proposed to be rendered by the appellant carriers to all points in Pennsylvania. The commission was of the belief, and it based its refusal of the present applications upon such belief, that, since the cement industry had not utilized the common carrier service of Gabler, Coastal, and Seaboard, it was premature for the appellant carriers and the cement industry to request the commission to find the existing motor carrier service to be inadequate. The commission stated that ". . . the position taken by the consignor industry, controlling all the traffic in this commodity, has to date precluded us from evaluating the adequacy as a whole of that service which is authorized." This was error. What the commission failed to recognize was the peculiar and somewhat specialized nature of the motor carrier needs of the eastern Pennsylvania cement industry which cannot be met simply by general common carrier authority, particularly that limited territorially to eastern Pennsylvania. While in the ordinary case the inadequacy of existing service is shown by an actual use of existing service which proves unsatisfactory, the inadequacy in this case arises by virtue of the inability of the authorized service to meet the demonstrated need, considering its nature and its territorial scope. See *Furst v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 330, 334, 134 A. 2d 435. The cement producing industry of eastern Pennsylvania should not be subjected to loss of business to competitors, who have motor carrier service available, because of the inadequacy of the available rail and motor service. See *Pennsylvania Railroad Company v. Pennsylvania Public Utility Commission,* supra, 185 Pa. Superior Ct. 115, 128, 138 A. 2d 279. Nor should the cement producers be required

to resort to private carriage when restricted common or contract carriage such as will fulfill their needs can be made available.

Among the declarations of policy made by the Legislature in enacting the Public Utility Law as it applies to motor carriers is the policy "to develop and preserve a safe highway transportation system properly adapted to the needs of the commerce of the Commonwealth of Pennsylvania and insure its availability between all points of production and markets of this Commonwealth." Section 801 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1301. The existing rail service as augmented by the motor carrier service of Gabler, Coastal, and Seaboard does not meet the "needs of the commerce" of the eastern Pennsylvania cement producers, nor does it "insure its availability between all points of production and markets." Of course, policy alone will not support a grant of authority. *Aizen v. Pennsylvania Public Utility Commission*, 163 Pa. Superior Ct. 305, 316, 60 A. 2d 443. But the evidence clearly demonstrates the need of the eastern Pennsylvania cement industry to have motor carrier service available from the places of production to the places of market throughout the state. And the motor carrier service shown to be necessary was of a specialized and peculiar nature unavailable from existing rail and motor carriers.

In *Pittsburgh and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission,* supra, 170 Pa. Superior Ct. 411, 420, 85 A. 2d 646, 651, a case similar to the instant case, the commission granted a certificate upon the reasoning that: " 'Certainly, when the nature of an industry such as the cement business requires speedy delivery of its product on occasion, there is no justifiable reason why a shipper should be forced to utilize solely the facilities of a carrier that

can not provide the needed service. . . . motor transportation is needed as an additional service to meet that type of service offered by its [shipper's] competitors and to accommodate those of its customers who either are not equipped for rail service or demand motor carrier service to meet their particular needs.' " This statement characterizes the instant case.

We turn to a consideration of several other matters involved on these appeals.

One of the factors influencing the commission to refuse the applications was its conclusion that there had been a concert of action between the appellant carriers and the eastern Pennsylvania cement industry "looking to monopolization of the motor transportation market for cement in eastern Pennsylvania . . . to the exclusion of other motor carriers already certificated." The commission reached this conclusion based on a lengthy discussion of the substantial financial arrangements made by the cement producers and the appellant carriers, the long range formulation of policy concerning the motor shipments of cement by the cement industry, the cement industry's support of an individual carrier for each producer (except in one instance), and the cement industry's change in position from one opposing motor carrier service at the time Gabler, Coastal, and Seaboard applied to one supporting the present applications. The conclusion of the commission that there was a concert of action to monopolize the motor transportation of cement in eastern Pennsylvania to the exclusion of other carriers amounted, in effect, to an accusation of wrongful or criminal conspiracy. The applicants and the cement industry emphatically denied any wrongful concert of action.

The commission's conclusion of irregularity was unfounded. While of necessity there had to be pre-

vious arrangements between each cement company and the individual carrier whose application the cement producer supported relating to the amount of equipment, the facility arrangements at each plant, and the method of operation proposed to be instituted, there is no evidence and no inference can be drawn from the evidence of record that there was any wrongful or criminal conspiracy involved. Public transportation service, as all utility service, involves some degree of monopoly but a lawful and regulated monopoly in the interest of the public service and convenience. *Aizen v. Pennsylvania Public Utility Commission,* supra, 163 Pa. Superior Ct. 305, 310, 316, 60 A. 2d 443. In the case of a Class D common carrier seeking to serve one or a limited number of shippers, and in the case of a contract carrier, some previous arrangements between the shipper and the carrier are necessarily involved concerning the need which the shipper has, the inadequacy of the existing service, and the ability of the proposed carrier to render the necessary service. And, by their very nature, a limited Class D common carrier and a contract carrier seek to exclude the existing carriers if the necessity and the inadequacy of existing service be proved, as they have been in this case. Obviously, the fact that the cement industry supported the applications of the appellant carriers was not ground for the suspicion that the proceedings were irregular. The commission previously granted applications which were jointly supported by segments of an industry acting together. See *Merchants Parcel Delivery, Inc. v. Pennsylvania Public Utility Commission,* supra, 150 Pa. Superior Ct. 120, 123, 125, 28 A. 2d 340.

Although the commission does not have jurisdiction to determine whether a proposed application is in violation of antitrust laws, it may consider the policy of the antitrust laws in determining the issue of

public convenience and necessity and the issue of competition. See *Re Pacific Northwest Pipe Line Corporation,* 31 P.U.R. 3d 456, 461; *Pittsburgh v. Federal Power Commission,* 237 F. 2d 741, 754; *Minneapolis and St. Louis Railroad Company v. United States,* 361 U. S. 173, 80 S. Ct. 229, 4 L. Ed. 2d 223, 232. Here the necessity and the convenience of the eastern cement producing industry were clearly demonstrated as was the inadequacy of the existing rail and motor carrier service. The need was a peculiar and special one which appellants proposed to fill. We note also that the commission's refusal of these applications limits the number of motor carriers available to the cement industry to the three existing carriers whose service is shown to be inadequate, whereas, the appellant carriers number five and offer service commensurate with the need.

A question is raised concerning whether the operations of appellants as common carriers (except for Schwerman) in intrastate commerce and as contract carriers in interstate commerce, should those applications be granted, violate the provisions of section 805 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1305. Section 805 provides: ". . . no person or corporation shall at the same time hold a certificate of public convenience as a common carrier by motor vehicle and a permit as a contract carrier by motor vehicle, unless for good cause shown, the commission shall find that such certificate and permit may be held consistently with the public interest and with the policy declared in section eight hundred one of this act."

The commission in its order did not decide this issue because of its ultimate refusal of the applications of appellants.

Our review indicates that the applications of appellants should have been granted, and that the grant

will not violate the prohibition of section 805. As we have indicated, the grant of these applications is consistent with the public interest and the policy declared in section 801, particularly as that policy relates to promotion of commerce. The compelling need for the proposed specialized service appearing from the evidence, together with the avowed policy of the Legislature to make products, as, in this instance, of the eastern Pennsylvania cement producers, available in the markets of this Commonwealth satisfy the good cause requirement of section 805 for grant of diverse types of certificates. This is especially true since the restricted common carrier rights applied for are, for all practical purposes, the same as contract carrier rights.

We conclude, therefore, that the order of the commission refusing the applications of appellants is not consistent with the basic facts; that the substantial and competent evidence presented by appellants justified an order in their behalf; that the action of the commission was capricious, arbitrary, and unreasonable; and that the commission committed error of law in refusing the applications. *Motor Freight Express v. Pennsylvania Public Utility Commission*, 180 Pa. Superior Ct. 622, 627, 121 A. 2d 617; *Reading Company v. Pennsylvania Public Utility Commission*, 191 Pa. Superior Ct. 635, 641, 159 A. 2d 61.

The order of the commission is reversed, and the record is remanded to the commission for action not inconsistent with this opinion.