Federal Reserve Bank of Philadelphia, Central Penn National Bank, Provident National Bank, First Pennsylvania Banking and Trust Company, The Fidelity Bank, Girard Trust Bank, Mellon National Bank and Trust Company, and The Philadelphia National Bank, Appellants, *v.* Pennsylvania Public Utility Commission, Appellee, and Purolator Courier Corp. and Protective Motor Service Company, Intervening Appellees.

Argued September 9, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*James H. McConomy,* with him *Andrew N. Farley, Eric P. Reif, Reed, Smith, Shaw & McClay,* and *Hiliary H. Holloway,* of counsel, for appellants.

*Robert J. Mulligan, Jr.,* Assistant Counsel, with him *Alfred N. Lowenstein,* Assistant Counsel, and *Edward Munce,* Acting Counsel, for appellee.

*V. Baker Smith,* with him *James W. Patterson,* and *Morgan, Lewis & Bockius,* of counsel, for intervening appellees.

OPINION BY JUDGE MENCER, October 22, 1974:

This appeal is by intervenors from an order of the Public Utility Commission (Commission) granting two

applications requesting conversions of contract carrier authority to that of a Class D common carrier.

On October 22, 1969, American Courier Corporation (American)[1] filed an application with the Commission which sought to convert all of American's contract carrier authority to that of a Class D common carrier. On October 9, 1970, Protective Motor Service Company (Protective) filed a similar application seeking the same conversion of authority.

A consolidated hearing on both applications was held on December 7, 1970. All of applicants' witnesses testified at this hearing. No protests were filed to either application until February 4, 1971, when the Federal Reserve Bank of Philadelphia petitioned to intervene in the proceedings pertaining to both applications. Like petitions to intervene were filed with the Commission by The Philadelphia National Bank (April 14, 1971), The Fidelity Bank (April 16, 1971), Girard Trust Bank (April 27, 1971), Mellon National Bank and Trust Company (April 28, 1971), and Central Penn National Bank (May 14, 1971). The petitions to intervene were granted by the Commission, and all of the aforementioned banks (intervenors) participated in the subsequent hearings held on May 19, 1972 and September 13 and 14, 1972. The intervenors and other members of the banking industry are substantial users of the services offered by American and Protective.

A stipulation was presented to the Commission on September 20, 1971. This stipulation was prepared and signed by the applicants, American and Protective, and by four of the intervenors; namely, the Federal Reserve Bank of Philadelphia, Mellon National Bank and Trust Company, The Philadelphia National Bank, and Girard Trust Bank.

---

[1] American Courier Corporation presently engages in business under the name of Purolator Courier Corp.

The stipulation would have modified the applications[2] so as to permit continued contract carriage to banks and banking institutions and to allow American and Protective rights for common carrier authority to serve all other customers, with interlined authority extended to both services. The provisions of the stipulation specified that American and Protective would not be required to file with the Commission copies of contracts or schedule of rates, but instead they would file a list of all banks served, such list to be updated every six months. Further, if the Commission preferred, American and Protective would file for each bank customer, except armored car service, a contract and schedule of charges or would file a standard contract and a copy of the schedule of services and charges for each banking customer, to be updated every six months.

The intervenors do not assert, or cite any authority to indicate, that the Commission was bound by the terms of the stipulation or that the Commission was not free to disregard or reject it.[3] However, the inter-

---

[2] The record discloses that American and Protective never amended their original applications which sought a total conversion of their contract carrier authority to that of Class D common carriers. Significantly paragraph 4 of the stipulation expressly provides that American and Protective "will modify their applications presently pending before the PUC . . . provided" that four specific conditions be approved by the Commission. The amendment or modification of the applications was surely a future action which not only did not occur but was conditioned upon the Commission's indicating advance approval of the conditions spelled out as 4(a), (b), (c), and (d) of the stipulation. The Commission deferred action on the stipulation, American and Protective did not move to amend their applications, and after the completion of the hearings the Commission rejected the stipulation by its "short form" order entered November 21, 1973.

[3] In *Foley Brothers, Inc. v. Commonwealth*, 400 Pa. 584, 163 A. 2d 80 (1960), it was held that the Board of Arbitration of Claims had the right to reject stipulation of parties that all three arbitrators must be present at each session, in view of statute

venors, as the cornerstone of their appeal, contend that by the Commission's failure to reject the stipulation prior to the conclusion of the hearings they were lulled into presenting evidence at the May and September 1972 hearings in support of the stipulation rather than in opposition to the pending applications of American and Protective.

It is agreed that the Commission, after receipt of the stipulation from its signators, did nothing for nearly three months until, by letter of December 14, 1971, the Commission advised that action on the proposed stipulation was being deferred and indicated that the merits of the stipulation should be developed at the next hearing. The next hearing was held on May 19, 1972, and at the outset the intervenors offered the stipulation into evidence. Thereafter the intervenors presented testimony designed to demonstrate the compelling nature of the provisions of the stipulation.

On November 21, 1973, the Commission entered an order in "short form" granting in full the applications of American and Protective. Intervenors filed this appeal on December 19, 1973, and the Commission reaffirmed its "short form" order by a "long form" order entered February 28, 1974.

Initially, we must be mindful of our role and scope of review in appeals of this nature. Equally applicable here is that portion of our opinion in *York v. Public Utility Commission*, 3 Pa. Commonwealth Ct. 270, 275-76, 281 A. 2d 261, 263-64 (1971), which reads:

"Section 1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. 1437, provides: '... The order of the commission shall not be

_____

providing that two members of Board shall constitute a quorum. Here stipulation provided for filing of contracts by contract carriers contrary to the applicable statutory provisions (Act of May 28, 1937, P. L. 1053, art. VIII, §809, 66 P.S. §1309).

vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights. . . .' Section 1112 of the same Act, 66 P.S. §1442 provides: 'Whenever the commission shall make any rule, regulation, finding, determination, or order under the provisions of this act, the same shall be prima facie evidence of the facts found. . . .'

"Our authority to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or violation of constitutional rights. Clemmer v. Pennsylvania Public Utility Commission, 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966). Likewise, we may not exercise our independent judgment on the record or resolve conflicting evidence. Pittsburgh Railways Company v. Pennsylvania Public Utility Commission, 198 Pa. Superior Ct. 415, 182 A. 2d 80 (1962). Our inquiry is directed to whether there is substantial evidence to support the Commission's action. Pittsburgh & Lake Erie Railroad Co. v. Pennsylvania Public Utility Commission, 170 Pa. Superior Ct. 411, 85 A. 2d 646 (1952). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pennsylvania State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129, 61 A. 2d 343 (1948). Substantial evidence has also been said to mean evidence affording a substantial basis of fact from which the fact in issue can reasonably be inferred. Substantial evidence is synonymous with competent and relevant evidence having a rational probative force. In Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission, 425 Pa. 501, 229 A. 2d 748 (1967), it was held that in view of Section 1107 of the Public Utility Law of 1937, the

Pennsylvania Public Utility Commission's exercise of its discretion must be accepted by the courts unless its action is totally without support in the record, or is based on an error of law or is unconstitutional."

A unique feature of this appeal is that American and Protective were granted all that their applications sought and find themselves hard-pressed to complain that the Commission erred in not granting them rights that they did not formally seek but only indicated they would request if the Commission would give advance approval to an unsolicited conditional stipulation. In a like vein, the intervenors acknowledge that on this record they did not urge the inadequacy of American and Protective to perform as common carriers or the denial of the applications in their entirety. The intervenors argue that this is true because of the existence of the proposed stipulation, the purpose of which was to urge upon the Commission the necessity of granting to American and Protective dual operating status. Such dual status would grant them contract carrier status as to bank items and common carrier status as to other items.

Since American and Protective did not make application for dual carrier status and were granted by the Commission all that they sought, and since the Commission's grant-of-authority order was amply supported in the record by substantial evidence, we must affirm. Our reading of the extensive record convinces us that the Commission was correct in concluding that American and Protective met the test of fitness and that the grant of the conversion application in each instance "is necessary or proper for the service, accommodation, convenience or safety of the public. . . ." Act of May 28, 1937, P. L. 1053 (Public Utility Law), art. II, §203, 66 P.S. §1123.

Intervenors do not seriously dispute this evaluation of the existing record but strongly assert that (1) the

record establishes the desirability and justification for the Commission's accepting the provisions of the proffered stipulation, (2) it was error for the Commission not to approve the dual carrier status proposed by the stipulation, and (3) it was unfair and a denial of due process for the Commission to have deferred action on the stipulation until after the close of the hearings, thereby misleading intervenors.

We find no merit in these assertions and therefore will not linger over them. Section 805 of the Public Utility Law, 66 P.S. §1305, provides that ". . . no person or corporation shall at the same time hold a certificate of public convenience as a common carrier by motor vehicle and a permit as a contract carrier by motor vehicle, unless for good cause shown, the commission shall find that such certificate and permit may be held consistently with the public interest and with the policy declared in section eight hundred one of this act [66 P.S. §1301]."

Section 801 of the Public Utility Law, 66 P.S. §1301, is a declaration of policy which reads as follows: "It is hereby declared to be the policy of the Legislature to regulate in this act the service of common carriers by motor vehicle and forwarders in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in such service, and among such carriers and forwarders in the public interest; to promote safe, adequate, economical, and efficient service by common carriers by motor vehicle and forwarders, and just and reasonable rates therefor, without unjust discrimination, and unfair or destructive practices; to improve the relations between, and coordinate the service and regulation of, common carriers by motor vehicle, forwarders, and other carriers; to develop and preserve a safe highway transportation system properly adapted to the needs of the commerce of the Commonwealth of Pennsylvania and insure its

availability between all points of production and markets of this Commonwealth. It is hereby found as a fact, after due investigation and deliberation, that the service of common carriers by motor vehicle, forwarders, contract carriers by motor vehicle, and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, are so closely interwoven and interdependent, and so directly affect each other, that in order effectively to regulate such common carriers by motor vehicle and forwarders, and to provide a proper and safe highway transportation system in the public interest, it is necessary to regulate the service of such contract carriers by motor vehicle and brokers, including the procurement and provision of motor vehicles and other facilities for the safe transportation of passengers or property over the highways, in the manner set forth in this article."

Intervenors rely on *Chemical Tank Lines, Inc. v. Pennsylvania Public Utility Commission*, 193 Pa. Superior Ct. 607, 165 A. 2d 668 (1960), *aff'd*, 406 Pa. 359, 178 A. 2d 698 (1962), to support the proposition that the Commission's rejection of the stipulation and refusal to grant dual carrier status in this case was capricious, arbitrary and unreasonable. In *Chemical Tank Lines* it was held that the evidence established that the rail service, as supplemented by the existing motor carrier service, was inadequate to render the specialized and peculiar service to all points in Pennsylvania required by the cement industry in eastern Pennsylvania to meet its competition and therefore, in view of the inability of the authorized motor carrier service to meet the demonstrated need, it was error for the Commission to hold that the failure of the cement industry to utilize the authorized common carrier service precluded the Commission from evaluating the adequacy as a whole of the authorized service. It was

also held that the operations of the applicants as common carriers in intrastate commerce and as contract carriers in interstate commerce, given the existing compelling need for the proposed specialized service, would not violate the provisions of Section 805 of the Public Utility Law.

A comparison of this record with the record in *Chemical Tank Lines* results in the conclusion that they are distinguishable and that *Chemical Tank Lines* is not controlling here. The Superior Court was confronted with two different regulatory agencies because of the interstate and intrastate aspects of the operation and the standard of "good cause" applicable was not identical to the present case. A very important difference is that in *Chemical Tank Lines* the record supported a finding that existing authorized service was inadequate as compared to this case where the record supports a finding that a common carrier operation is not incompatible with rapid courier service. Actually, the interest of security would be enhanced where bank item couriers operate as common carriers free of a statutory requirement imposed on contract carriers to file, and obtain Commission approval of, each contract. Further, we take note that in *Chemical Tank Lines* the Superior Court's decision rested in part on the factor that "the restricted common carrier rights applied for are, for all practical purposes, the same as contract carrier rights." 193 Pa. Superior Ct. at 628, 165 A. 2d at 677. In contrast, the instant appeal concerns Class D common carrier rights which are not similarly restrictive but are open to consignors, consignees and territory.

We must conclude that the particularized needs of customers is only one element of the good-cause standard of Section 805. Although intervenors have convincingly demonstrated a particular need for the banks' utilizing the services of American and Protective, it

does not follow that this automatically requires the Commission to allow dual carrier status. We do not read *Chemical Tank Lines, Inc. v. Pennsylvania Public Utility Commission, supra,* to so imply. This is especially true where, as here, the evidence indicates that the services of the applicants as common carriers will be equal or more advantageous than their services as contract carriers in fulfilling the particular needs of the bank shippers.

Intervenors complain that the Commission erred in relying on certain portions of the rejected stipulation to explain its final ruling. Although the stipulation was rejected by the Commission, there can be no denying that the stipulation was admitted in evidence by the intervenors and was a part of the record before the Commission. More significant, a review of the entire record reveals, as does the stipulation, that the avoidance of the requirement for filing individual contracts and the allowance of interlining and commingling of transportation items are primary goals which intervenors and applicants consider essential. It was the Commission's conclusion, and the original proposal of American and Protective, that these two goals would best be served by granting applicants common carrier status. Our examination of this record directs us to the sole terminus that the Commission's action was not arbitrary, capricious, or unreasonable and that its order should be affirmed.

### ORDER

AND NOW, this 22nd day of October, 1974, the order of the Pennsylvania Public Utility Commission entered February 28, 1974, which reaffirmed the grant of authority to American Courier Corporation, now known as Purolator Courier Corp., and Protective Motor Service Company to operate as Class D common carriers, is hereby affirmed.