**GLOBAL TEL\*LINK CORPORATION,**
Petitioner

v.

**DEPARTMENT OF CORRECTIONS,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 9, 2015.

Decided Feb. 6, 2015.

Karl S. Myers, Philadelphia, for petitioner.

Valerie Janosik–Nehilla, Assistant Counsel, and Julie R. Tilghman, Assistant Counsel, Mechanicsburg, for respondent.

C. Grainger Bowman, Harrisburg, for amicus curiae Securus Technologies, Inc.

BEFORE: DAN PELLEGRINI, President Judge, and ROBERT SIMPSON, Judge, and ROCHELLE S. FRIEDMAN, Senior Judge.

OPINION BY President Judge PELLEGRINI.

Global Tel*Link Corporation (GTL) petitions for review of the order of the Department of Corrections (Department) dismissing GTL's bid protest of the selection of Securus Technologies, Inc. (Securus) for contract negotiations as a result of Request for Proposal No. 2013–90 (RFP)[1] involving a contract for a secure inmate telephone system (ITS) to provide telephone services and call monitoring and recording for inmates housed at Department facilities. We affirm.

## I.

In October 2013, the Department issued the RFP "to provide inmates confined at [Department] facilities with a highly reliable, high quality service to call family and friends, give the [Department] the capability to perform oversight and monitoring of inmate calls and fund the inmate general welfare fund." (Reproduced Record (RR) at 69a). The RFP stated that the sole point of contact was the Issuing Officer and that the Department would notify in writing the offeror "whose proposal is determined to be the most advantageous" by a committee of qualified personnel (Evaluation Committee) after considering "all of the evaluation factors." (*Id.* at 69a, 83a).[2]

The following criteria was to be used to evaluate the proposals: (1) technical considerations such as inmate telephone service, contractor qualifications, capability and capacity for monitoring and recording, ease of use and investigative and intelligence features, maintenance and training (50% of total points); (2) cost rating giving the proposal with the lowest total cost the maximum number of points and rating the others based on a predetermined formula (30% of total points); (3) Small Diverse Business (SDB) Participation granting additional points based on the extent of SDB participation (20% of total points); and (4) Domestic Workforce Utilization (DWU) adding bonus points to the total points based on the use of the domestic work force in fulfilling the contract (3% bonus points). The RFP specifically provided that an offeror's proposal must receive at least 70% of the available technical points to be eligible for selection for continued consideration and the submission of a best and final offer (BAFO) and contract negotiations and that the Department "must select for contract negotiations the Offeror most advantageous to the purchasing agency, taking into consideration price and all evaluation factors, shall be selected for contract negotiation." 62 Pa.C.S. § 513(g). The Procurement Code does not provide a "rigid, detailed procedure or strict requirements for the RFP process," but "preserves a great deal of agency discretion ...." *Stanton–Negley Drug Company v. Department of Public Welfare*, 943 A.2d 377, 387 (Pa.Cmwlth.), *appeal denied*, 598 Pa. 784, 959 A.2d 321 (2008).

---

1. Section 513(a) of the Commonwealth Procurement Code (Procurement Code) states that "[w]hen the contracting officer determines in writing that the use of competitive sealed bidding is either not practicable or advantageous to the Commonwealth, a contract may be entered into by competitive sealed proposals." 62 Pa.C.S. § 513(a).

2. Section 513(g) of the Procurement Code states that "[t]he responsible offeror whose proposal is determined in writing to be the

with the highest overall score ...." (RR at 86a, 87a).

The Department was permitted to seek oral or written clarification of a proposal at any stage of the selection process prior to contract execution "to ensure thorough mutual understanding" and "responsiveness" to its requirements. (RR at 72a).[3] The Department also reserved the right to request additional information necessary to ensure the offeror's ability to perform, to conduct investigations "as deemed necessary" to determine an offeror's ability to perform, and to reject a proposal if the additional information or investigation fail to show the proper qualification to carry out the obligations of the RFP. (*Id.* at 78a). Any offeror determined to be "reasonably susceptible of being selected" could also be required to provide a site demonstration to show "the functional capability" to perform and that "[t]he proposed equipment and software must be in production, installed and in use by one (1) or more customers of the Offeror ...." (*Id.* at 112a). In addition, "[t]he demonstration of the proposed solution as proposed in the RFP shall be conducted at an offeror's customer location" and "[t]he solution to be demonstrated must be operational, in production, and in operation at the site." (*Id.* at 112a, 113a).

The Department was to notify all offerors in writing of the offeror selected for contract negotiations after determining "the proposal that is most advantageous to the [Department]." (RR at 76a). The Department would also notify offerors whose proposals were not selected when contract negotiations were successfully completed and the Department has received the final contract signed by the selected offeror. On receiving notification of non-selection, an offeror was given the opportunity to be debriefed or to file a protest "within **seven** days after the protesting party knew or should have known of the facts giving rise to the protest," but it could not be filed "later than **seven** days after the date the notice of award of the contract is posted on the [Department of General Services] website." (*Id.* at 76a–77a) (emphasis in original).[4]

In December 2013, the Department received proposals from Securus, CenturyLink Public Communications, Inc. (CenturyLink), GTL and Telmate. In March 2014, the Issuing Officer issued a Recommendation for Contractor Selection, indicating that the Evaluation Committee scored the technical proposals and that CenturyLink and Telmate did not meet the threshold 70% of the points necessary to be considered for a site demonstration, BAFOs or selection for contract negotiations: CenturyLink received 348.68 and Telmate received 330.50 out of the 500 total points available. (RR at 12a, 13a, 45a). Because GTL and Securus received

---

3. Section 513(f) of the Procurement Code states:

> As provided in the [RFP], discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining [BAFOs]. Responsible offers shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. In conducting the discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors.

62 Pa.C.S. § 513(f).

4. Section 1711.1(b) of the Procurement Code states that "[i]f the protestant is a[n] ... offeror ... the protest shall be filed within seven days after the aggrieved ... offeror ... knew or should have known of the facts giving rise to the protest except that in no event may a protest be filed later than seven days after the date the contract was awarded ...." 62 Pa. C.S. § 1711.1(b).

over 70% of the total available points, they were asked to provide site demonstrations for the Committee.

The inmate telephone service, monitoring and recording, and investigative and intelligence capability components of the technical score were based on the site demonstration. GTL chose to conduct its site demonstration at the Colorado Department of Corrections–Cheyenne Mountain Reentry Center. However, several features in GTL's proposal, including the Call IQ and Data IQ features,[5] were not operational at the Colorado site during the demonstration.

Following the site demonstrations, the Evaluation Committee reported the results to the Issuing Officer and Securus's and GTL's technical scores were updated. The Department opened and scored the cost proposals and combined the technical scores, cost scores, bonus points and SDB scores received from the Bureau of Small Business Opportunities. Because the Department determined that the scores placed Securus and GTL within the competitive range of proposals that were reasonably susceptible for selections, it requested Securus and GTL to submit BAFOs for their cost and SDB proposals and the BAFOs were scored and the final technical, cost, SDB and DWU scores were combined. Ultimately, Securus received the highest overall score of 861.32 points (500 technical points;[6]

231.32 cost points; 100 SDB points; and 30 DWU points) while GTL received an overall score of 802.51 points (382.85 technical points; 300 cost points;[7] 89.30 SDB points; and 30 DWU points).

In March 2014, the Department determined that Securus's proposal was the most advantageous to the Commonwealth and selected Securus for contract negotiations.[8] In April 2014, the Department executed the contract with Securus and notified GTL of its non-selection. (RR at 9a, 45a).

The Department conducted a debriefing and informed GTL of the following weaknesses in its proposal: (1) the called party could give short messages during the introduction message in conflict with the RFP; (2) the three-way reporting feature was weak because over 100 three-way calls were completed while only three were detected demonstrating a low level of detection; (3) many reports showed that features were not enabled at the host site so they were unable to verify the proposed solutions; (4) the TTY was not shown in use and was just viewed as a static device; and (5) it was a poor site demonstration. More specifically, the Evaluation Committee was dissatisfied with GTL's failure to demonstrate the Call IQ and Data IQ features at the site demonstration in addition to the enumerated weaknesses.

GTL filed a bid protest,[9] alleging that the technical and SDB scores were errone-

---

5. Call IQ allows the ITS to search for key words or phrases and provides a text of the record to find gang activity while Data IQ matches up recorded calls to determine who is calling whom. (RR at 396a n. 1).

6. Securus received the total possible technical points because the RFP provided that the offeror with the highest raw technical score be given the maximum score of 500 points. (RR at 84a).

7. GTL received the total possible cost points because the RFP also provided that the offer-

or with the lowest raw cost score be given the maximum score of 300 points. (RR at 84a).

8. Section 561 of the Procurement Code provides that the determinations required by Section 513(a) and (g) "are final and conclusive unless they are clearly erroneous, arbitrary, capricious or contrary to law." 62 Pa.C.S. § 561.

9. The contract award to Securus was stayed pending the resolution of GTL's protest. (RR at 46a). *See* Section 1711.1(k) of the Procure-

ous. (RR at 3a–6a, 396a). While GTL admitted that it did not have the system in Colorado configured to demonstrate the Call IQ and Data IQ features, it asserted that this was because "Department representatives, when they arranged the site visit, never asked for alterations to the Colorado system for purposes of the demonstration. In fact they expressly stated the Colorado system should be left as-is and no alterations should be made." (*Id.* at 5a). The Secretary permitted Securus to participate in GTL's protest and to file responses to GTL's submissions and GTL repeatedly objected to its participation.

Because the foregoing allegation was not denied or explained in the Issuing Officer's response to the protest, the Secretary issued an order directing that a hearing be conducted limited to the following issues: (1) whether a Department employee made representations to any GTL employee prior to the site demonstration that "'the Colorado system should be left as-is and no alterations should be made;'" and (2) if such a representation was made, whether GTL's failure to demonstrate Call IQ and Data IQ impact its technical score and if so, to what extent. (RR at 166a). The order also stated that Securus, as the successful bidder, could attend the hearing, but could only cross-examine witnesses and make oral argument. (*Id.*).

At the hearing,[10] GTL's Account Executive, James Beamer (Beamer), testified that he communicated with the Department's Issuing Officer, Russ Ilgenfritz (Ilgenfritz), and Chief of Support Services, Steve Hilbish (Hilbish), by telephone and e-mail. He stated that he received a tele-

phone call from them in early February 2014 and discussed how the Colorado GTL system was set up. He testified that it was significant that both Ilgenfritz and Hilbish called because he "would not take anything directly from [Hilbish] without having it confirmed by [Ilgenfritz], that was what the [Department] wanted. Because all of my communications, to be valid, had to go through [Ilgenfritz]." (RR at 348a). He stated that they discussed what would occur at the site demonstration and that 100 or so test calls would be made to test the system's clarity and three-way call detection. Beamer testified that he offered to get the settings at the Colorado system the same as they were at the Department's system or as the RFP required, and that Hilbish "indicated that wouldn't be necessary, that they didn't want us to change the settings at Colorado, the Colorado system. They wanted to see how that system actually operated." (*Id.* at 345a). Beamer stated that when Hilbish said that to him, it was his understanding that he was not supposed to alter the Colorado system. He stated that aside from that telephone call, he did not have any further communications with Ilgenfritz and Hilbish regarding the settings of the Colorado system for the site demonstration, and that based on that call, he thought that he was "told not to change any of the settings in Colorado." (*Id.* at 348a–349a). He testified that he "relayed it to the team that we weren't to change the settings" and that the Department "wanted to see the system as Colorado was currently using it." (*Id.* at 349a).

---

ment Code, 62 Pa.C.S. § 1711.1(k) ("In the event a protest is filed timely under this section and until the time has elapsed for the protestant to file an appeal with Commonwealth Court, the purchasing agency shall not proceed further with the solicitation or with the award of the contract . . . .").

10. GTL again objected to Securus's participation and the Secretary denied GTL's request for reconsideration of his determination in this regard. (RR at 185a–186a).

Ilgenfritz testified that both he and Hilbish were present for the entire February 2014 conference call to Beamer. He testified that he did not make any representation to GTL employees that they should not change anything at the Colorado site or that the Colorado system should be left as-is with no alterations. He went on to state that he would remember if such a statement had been made and if he had made such a statement, correspondence with his recollection of that discussion would have been sent to both GTL and Securus. He testified that he had a telephone conversation with Securus involving logistical requirements regarding PIN numbers and clearances for setting up the site demonstration, and that conversation was documented in a letter sent to both GTL and Securus. He stated that as the Issuing Officer for this RFP, he could modify or waive its requirements but did not waive or modify this RFP.

Ilgenfritz also testified that Call IQ and Data IQ fell within the investigative and intelligence capability portion of the RFP's technical score and that the total points available for that category was 60 points. (RR at 302a, 305a). He stated that Securus's raw technical score was 467.21 points; GTL's raw score was 357.74 points; and its final prorated technical score was 382.85, so that while he did not know GTL's actual score, the difference between their scores was larger than the 60 points that was available for that category involving the Call IQ and Data IQ functions.

Hilbish testified that both he and Ilgenfritz were present for the entire February 2014 conference call to Beamer. He stated that they discussed when they would be flying in and if GTL made transportation arrangements. He testified that he did not make the statement that the Colorado system should be left as-is and that no alterations should be made and that he did not recall Ilgenfritz making the statement. He stated that as a member of the Evaluation Committee, he could not waive any of the RFP requirements unless confirmed by the Issuing Officer.

## II.

In June 2014, the Secretary denied GTL's protest and vacated the stay of the award finding Beamer's testimony credible that during the February 2014 conference call with Ilgenfritz and Hilbish dealing with travel logistics for the site demonstration, "he *believed* that he heard a statement from [Hilbish] that it would not be necessary to 'change the settings' at the Colorado demonstration site to conform to those already being used by the Department." (RR at 398a) (emphasis in original). The Secretary also found credible Ilgenfritz's testimony that he did not recall Hilbish making such a statement and Hilbish's testimony that he did not make a statement to Beamer that it would not be necessary to "change the settings" at the Colorado site demonstration to conform to those used by the Department. (*Id.*). The Secretary found that "Beamer did rely on a statement he *thought* he heard and did not direct any reconfiguration of the settings at the demonstration site" including the Call IQ and Data IQ functions, but that "Beamer's reliance was not justifiable." (*Id.*) (emphasis in original).[11] He

11. The Secretary explained:
[T]he crux of the demonstration's shortcomings turns on whether [GTL], and Mr. Beamer in particular, was misled by any alleged statement of Mr. Hilbish. As noted above, I found all the witnesses to be truthful in what *they believe* was said and heard. But my role is also to determine what version of the telephone call was the accurate one. I have carefully reviewed this crucial testimony and conclude that Mr. Hilbish did not make the statement in issue. I so

found that the Evaluation Committee "acted appropriately" in deducting points for GTL's site demonstration because it did not demonstrate the Call IQ and Data IQ functions at the Colorado facility, and that the deduction did not change the final outcome of the scoring so that even if the alleged statement had been made "it would have resulted, at most, in harmless error in [GTL]'s score." (*Id.* at 398a–399a).[12]

Finally, regarding Securus's participation in the protest, the Secretary noted that while the Procurement Code is silent on whether a selected contractor can participate in a bid protest, the Department of General Service's Procurement Handbook permits such participation where "substan-

tial issues are raised by the protest." (RR at 401a).[13] The Secretary determined that Securus "has an interest much like that of a civil service employee who is selected for a job in a case where a non-selectee files a civil service appeal," and that this Court "has made clear that the selectee is not only an important party, but an indispensable one to the litigation." (*Id.* at 401a–402a) (citation and footnote omitted). Nevertheless, the Secretary explained that "*nothing* Securus submitted to me actually impacted on my decision on the merits." (*Id.* at 402a n. 3) (emphasis in original).[14]

### III.

### A.

Turning to the question of the scoring itself, Mr. Ilgenfritz credibly explained that the subcategory for the Technical scoring at issue here was that entitled "Investigative and Intelligence Capability," for which a maximum of sixty points could be awarded. Mr. Ilgenfritz also testified credibly that, while he did not know the exact score [GTL] received in this subcategory, he knew it was not zero. Moreover, there was undisputed testimony that the technical point spread between [GTL] and Securus was over 100 points. Thus, there is evidence to show that even had [GTL] not been penalized for its omissions at the demonstration, it would have made no difference. Thus, any error would have been harmless at most.

(RR. at 407a) (citations and footnote omitted).

conclude because Mr. Hilbish ... testified that he understood that he had no authority to make such a change to an RFP. Further, Mr. Ilgenfritz, testified that he recalled no such statement being made and that he is the one who would have had the authority to make such a statement. Even Mr. Beamer acknowledged this. Mr. Ilgenfritz further testified that, in his opinion, such a change would have required written confirmation and notice to all vendors. That being said, I do believe that Mr. Beamer misunderstood something in the telephone conversation that led him to believe that the "settings" (which, to him, meant Call IQ and Data IQ, at least) did not need to be changed. I further conclude that he relied upon what he understood to have been stated. I conclude, however, that such reliance was not justifiable.

\* \* \*

Given the sophistication of [GTL] and the experience of Mr. Beamer I believe that for the reliance on the alteration of the RFP asserted here to have been justified Mr. Beamer would have had to have followed up in writing or at least specifically asked Mr. Ilgenfritz during the telephone call if he understood the statement correctly. It is undisputed that neither of these actions was taken.

(RR at 404a–406a) (emphasis in original and citations and footnotes omitted).

12. As the Secretary explained:

13. Specifically, Part I, Chapter 58(D) of the Procurement Handbook states, in relevant part, that "[i]f the protest is received before award and substantial issues are raised by the protest, all bidders and offerors who appear to have a substantial and reasonable prospect of winning the award shall be notified and may file their agreement/disagreement with the purchasing agency within five days after receipt of notice of protest."

14. The Secretary also addressed GTL's protest regarding the calculation of its SDB score, (RR at 402a–403a), but that claim is not at issue in this appeal.

In this appeal,[15, 16] GTL first argues that the Secretary's determination is not supported by substantial evidence because he found credible the testimony that Beamer believed the Department directed GTL to leave the settings for the system at the Colorado site as-is for the site demonstration, and the Department then erroneously deducted points for following its directive because the system did not conform to the requirements of the RFP. However, as outlined above, while the Secretary found credible Beamer's testimony that he *thought* that he heard such a directive from Hilbish, the Secretary specifically found credible the testimony that neither Hilbish nor Ilgenfritz, the person with the authority to waive such a requirement as the Issuing Officer, issued such a directive and determined that Beamer's reliance on Hilbish's purported waiver was not justified.

Clearly, the Secretary's finding in this regard is supported by substantial evidence[17] because both Hilbish and Ilgen-fritz directly testified that no such directive was communicated to Beamer. Additionally, Hilbish and Ilgenfritz testified that all communications regarding the RFP, including the modification or waiver of an RFP requirement, could only come from the Issuing Officer, Ilgenfritz, and the RFP itself stated that the "sole point of contact" was Ilgenfritz. Ilgenfritz also testified that all changes, modifications or waivers to the RFP's requirements could only properly be made in writing, and the RFP itself stated that "[t]he Issuing Office shall not be bound by any verbal information nor shall it be bound by any written information that is not either contained in the RFP or formally issued as an addendum by the Issuing Office." (*Id.* at 70a, 235a).[18]

### B.

GTL next claims that the Secretary erred in determining that the Department's deduction of points due to deficien-

15. Section 1711.1(i) of the Procurement Code states that "[t]he court shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency," and "[s]hall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law." 62 Pa.C.S. § 1711.1(i). "An abuse of discretion is not merely an error in judgment;" rather, "[a]n abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied or judgment exercised is manifestly unreasonable or is the result of partiality, prejudice, bias, or ill will." *Henderson v. Unemployment Compensation Board of Review,* 77 A.3d 699, 713 (Pa. Cmwlth.2013).

16. We denied Securus's application for leave to intervene and it filed an *amicus curiae* brief.

17. As this Court has explained:
Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence has also been said to mean evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred. Substantial evidence is also synonymous with competent and relevant evidence having a rational probative force.
*Federal Reserve Bank of Philadelphia v. Pennsylvania Public Utility Commission,* 15 Pa. Cmwlth. 360, 326 A.2d 643, 646 (1974) (citation omitted).

18. *See, e.g., Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 410 A.2d 292, 294 (1979) (citations omitted) ("[T]he Commonwealth or its subdivisions and instrumentalities cannot be estopped 'by the acts of its agents and employees if those acts are outside the agent's powers, in violation of positive law, or acts which require legislative or executive action.' As a result, '[p]ersons contracting with a governmental agency must, at their peril, know the extent of the power of its officers making the contract.' ").

cies at the site demonstration covered by the purported "as-is" directive was harmless because its protest was not limited to only the deduction of those points. However, as outlined above, the Secretary's determination that the Department did not issue the directive is clearly supported by substantial competent evidence and contradicts the premise underlying GTL's argument in this regard.

Additionally, the deductions in GTL's technical score were not limited to the deficiencies exhibited at the site demonstration that were cited in the debriefing notes. The Contracting Officer explained that GTL did not obtain the highest technical score based on a number of factors:

Preliminarily, it should be noted that while GTL takes issue with certain information provided by the Department at its debriefing, the debriefing statements made during the debriefing were never in themselves considered or evaluated in making the award. Nor is such debriefing information intended to be an exhaustive or comprehensive explanation of the proposal evaluation process. The weaknesses noted during the debriefing were solely meant to be illustrative of why GTL did not receive the maximum points for its technical proposal. So while GTL goes on at great lengths in its protest in an attempt to refute the weaknesses listed during the debriefing and place blame on the Department, the Department stands by the strengths and weaknesses identified during the debriefing and maintains that the scoring of GTL's proposal by the evaluation committee was reasonable. Although GTL has a very good technical proposal, Securus obtained a high overall technical proposal score.

(RR at 49a) (citations omitted). As noted above, the RFP provided that "[t]he final Technical scores are determined by giving the maximum number of technical points available to the proposal with the highest raw technical score" and "[t]he remaining proposals are rated by applying the Technical Scoring Formula ...." (*Id.* at 84a).

Moreover, the debriefing notes show that GTL's technical score was based on the following additional weaknesses during the site demonstration other than the Call IQ and Data IQ functions: (1) the called party could give short messages during the introduction message in conflict with the RFP; (2) the three-way reporting feature was weak because over 100 three-way calls were completed while only three were detected demonstrating a low level of detection; and (3) the TTY was not shown in use and was just viewed as a static device. (RR at 143a). While GTL conceded that the foregoing deficiencies were present at the site demonstration, it attributed the deficiencies to the configuration of the Colorado system and the "as-is" directive which, as outlined above, was not issued by the Department and the Department's failure to accept its offer to reconfigure the system to demonstrate their functionality. As noted above, the RFP required offerors to "demonstrate the functional capabilities of the proposed solution prior to final award" at the site demonstration, and that such a requirement could not be waived *ad hoc* at the discretion of the members of the Evaluation Committee on site. In sum, GTL's allegation of error in this regard is without merit.

### C.

■ Finally, GTL argues that Securus's participation in its protest and hearing was unlawful because the only proper parties to a protest are the protestant and the contracting officer under Section 1711.1 of the Procurement Code, and the selected bidder may not participate because it is not an enumerated party to a protest un-

der the statute. *See, e.g., West Penn Allegheny Health System v. Medical Care Availability and Reduction of Error Fund (MCARE)*, 11 A.3d 598, 605–06 (Pa. Cmwlth.2010), *aff'd,* 611 Pa. 200, 23 A.3d 1052 (2011) (explaining that "under the principle of *expressio unius est exclusio alterius,* the express mention of a specific matter in a statute implies the exclusion of others not mentioned").

 However, the Secretary noted that while the Procurement Code does not specifically provide for the participation of other parties in a protest, Chapter 58(D) of the Procurement Handbook provides for the participation of "all bidders and offerors who appear to have a substantial and reasonable prospect of winning the award . . . ." In sum, the Secretary did not err in permitting Securus to participate in the instant protest or hearing because its participation is not prohibited by the Procurement Code and is specifically provided for in the Procurement Handbook. *See Corizon Health, Inc. v. Department of General Services,* 2013 WL 3960974 (Pa.Cmwlth. No. 1740 C.D. 2012, filed January 4, 2013), slip op. at 15 ("The Procurement Code authorizes the presiding officer to solicit information he deems necessary to render a decision from many sources, including other bidders or offerors. 62 Pa.C.S. § 1711.1(e). The parties agree that under the DGS Procurement Handbook, 'all bidders and offerors who appear to have a substantial and reasonable prospect of winning the award shall be notified [of the protest] and may file their agreement/disagreement with the purchasing agency . . . .' DGS Procurement Handbook, Ch. 58(D). When Corizon filed its protest, the Deputy Secretary suspended the contract award to Wexford until after the protest was resolved, alerted the Contracting Officer and Wexford that a protest had been filed, and solicited responses. (F.F. ¶ 28.) Corizon has failed to establish that the Deputy Secretary's procedural decisions were prohibited by the Procurement Code or constituted an abuse of discretion.").[19]

Accordingly, the Department's order is affirmed.

### *ORDER*

AND NOW, this *6th* day of *February,* 2015, the order of the Department of Corrections dated June 30, 2014, at Docket No. BP–34 of 2014, is affirmed.

---

19. GTL also contends that the Secretary erred in relying on Chapter 58(D) because it only applies where "the protest is received before award" and the instant protest was filed after the award to Securus and in analogizing participation in the instant bid protest to the filing of a civil service appeal because Section 1711.1(j) of the Procurement Code permits this Court to "cancel[ ] the solicitation or award and declar[e] void any resulting contract." 62 Pa.C.S. § 1711.1(j). Nevertheless, GTL has failed to allege or demonstrate any prejudice resulting from Securus's participation and as the Secretary explained, "I recognize that my ruling creates a question of first impression and, should an appeal be taken from this decision, I make it clear that, in fact, *nothing* Securus submitted to me actually impacted on my decision on the merits." (RR at 402a n. 2) (emphasis in original). As a result, any error by the Secretary in this regard was harmless and does not require that his order be reversed. *See, e.g., Garner v. Pennsylvania Human Relations Commission,* 16 A.3d 1189, 1200 (Pa.Cmwlth.2011) ("[R]eversible error requires the determination 'must not only be erroneous, but also harmful or prejudicial to the complaining party.' *D.Z. v. Bethlehem Area School District,* 2 A.3d 712, 726 (Pa.Cmwlth.2010)[, *appeal denied,* 612 Pa. 693, 29 A.3d 798 (2011) ]. '[A]n order of an administrative agency will not be disturbed for harmless error.' *Id.* at 725–26.").